**Elizabeth PERRY, Plaintiff,**

v.

**CITY OF FORT WAYNE and Local Lodge 2569 of the International Association of Machinists and Aerospace Workers, Defendants.**

**Civ. No. F 82–48.**

United States District Court, N. D. Indiana, Fort Wayne Division.

May 14, 1982.

---

P. Stephen Miller, Lebrato & Miller, Fort Wayne, Ind., for plaintiff.

Lewis, Bowman, St. Clair & Wagner, William Julian, II, John F. Schmitt, Robert Wagner, Indianapolis, Ind., Frank J. Gray, Thomas D. Swihart, Fort Wayne, Ind., for defendants.

## ORDER

LEE, District Judge.

This matter is before the Court on plaintiff's February 25, 1982 Motion for Preliminary Injunction.

The Court held a hearing on this motion on March 15, 1982 at which the Court received testimony and heard arguments. The relevant facts as revealed by the record and adduced in this hearing are as follows. Plaintiff is an employee of defendant City of Fort Wayne and has been employed since March 26, 1980 as a Comprehensive Employment Training Act (CETA) staff service clerk. In this position plaintiff is subject to the provisions of the Collective Bargaining Agreement between the union and the City of Fort Wayne. Under Article V of the Agreement all employees represented by the union, even if they elect not to become union members, must pay to the union, as a condition of employment, an "agency fee" equal in amount to union dues. (Plaintiff's Exhibits 18 and 19).

Plaintiff did not immediately comply with this requirement and the union did not immediately enforce it. Rather, sometime in December 1980 or February 1981 plaintiff was contacted by the union and told that she had to pay her dues.[1] On February 26, 1981 plaintiff submitted a check to the union in payment of her initiation fee and her first month's dues. Her check was accompanied by a letter protesting the requirement that she pay any dues at all and specifically protesting the payment of any fees over the amount germane to collective bargaining. Plaintiff stated that she would not submit any further payments until she received a rebate for the amount not germane to collective bargaining purposes and verifiable evidence indicating an appropriate method to make this determination. (Plaintiff's Exhibit 4).

In response to this demand, the union sent her a copy of its "Circular 669" which describes union policy regarding refunds for

---

1. The testimony on this point was in conflict. Ms. Perry testified that she was first contacted by the union in February 1981. Mr. Knappenberger testified that he contacted plaintiff about paying her dues just after Christmas of 1980. The union's steward at plaintiff's office, Mr. Bumgardner, testified that he first contacted her in December, 1980.

those who object to the use of their fees for political purposes. Under the union procedure, at the close of each year a committee determines the percentage of the dues from that year which were used for political purposes. The union then uses this percentage to calculate the amount any objector had paid for political purposes, and this amount is deducted from his dues in the following year. (*See*, testimony of Frederick E. Roberts and plaintiff's Exhibit 7). Other than the unembellished copy of Circular 669, the union made no attempt to explain this procedure to plaintiff.

Plaintiff paid dues for three more months under continual protest, but after June 1981 she refused to pay monthly dues because she was not sure that she was going to get the rebate she demanded. (Transcript of Hearing, p. 87). She continued to refuse to pay the required fees even though she was aware that failure to make these payments would be cause for termination. (Transcript of Hearing, pp. 95–96). On February 22, 1982, plaintiff was terminated for failure to pay union dues or an agency fee. (Plaintiff's Exhibit 13).

Three days later, on February 25, 1982, plaintiff filed suit in this Court and sought a temporary restraining order to restrain defendants from conditioning her employment on full payment of union dues or an equivalent agency fee. This Court granted the motion and ordered defendant City of Fort Wayne to reinstate plaintiff to her former employment. The temporary restraining order expired March 15, 1982 but at the conclusion of the March 15, 1982 hearing the parties stipulated to a thirty (30) day extension of the restraining order contingent upon plaintiff tendering security to defendant union in the amount of Thirteen Dollars ($13.00). On April 15, 1982 the parties again stipulated to a thirty (30) day extension of the restraining order contingent upon the same conditions. Plaintiff now seeks a preliminary injunction compelling defendant City of Fort Wayne to reinstate plaintiff to her former employment pending a final determination on the merits.

■ A preliminary injunction is an extraordinary remedy which is not available unless the plaintiff carries the burden of persuasion as to the following prerequisites:

1. That the plaintiff has no adequate remedy at law and will be irreparably harmed if the injunction does not issue;

2. That the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendants;

3. That plaintiff has at least a reasonable likelihood of success on the merits; and

4. That the granting of a preliminary injunction will not disserve the public interest.

*Fox Valley Harvestore v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir. 1976).

Because the critical consideration here is whether plaintiff has shown a reasonable likelihood of success on the merits, the Court will begin its analysis with that issue.

*I. Likelihood of Success on the Merits.*

Plaintiff's action is brought under 42 U.S.C. § 1983 and alleges violations of plaintiff's rights under the First and Fourteenth Amendments. The Court has jurisdiction over this cause under 28 U.S.C. § 1343(3). Plaintiff presents a two pronged attack on the agency shop arrangement to which she is subject as a city employee. First, plaintiff argues that the agency shop agreement is unconstitutional on its face and that she cannot be required to pay an agency fee to the union as a condition of employment with the city. Second, even if the agency fee requirement is found to be valid, plaintiff argues that she cannot be required to pay any amount over and above the amount germane to collective bargaining purposes.[2]

2. In her complaint, plaintiff appears to raise only this second issue. However, in oral argument at the March 15, 1982 hearing it became clear that plaintiff also seeks relief on the basis of the first argument. Defendant argued this issue in his brief in opposition to plaintiff's

Plaintiff relies on the Supreme Court's decision in *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 1792, 52 L.Ed.2d 261 (1977), to show that her First Amendment rights are infringed by the agency shop arrangement here.[3] In *Abood*, public school teachers brought suit challenging the validity of an agency shop clause in the agreement between the Detroit Board of Education and their union. The terms of the agency shop were precisely the same as those presented here—plaintiffs, even though not members of the union, were required to pay to the union, as a condition of employment, a service fee equal in amount to union dues. *Id.* 97 S.Ct. at 1787. In Mr. Justice Stewart's plurality opinion, the Court stated:

> "To compel employees financially to support their collective-bargaining representatives has an impact upon their First Amendment interests." *Id.* at 1793.

Justice Powell wrote in his concurring opinion:

> Certainly, if individual teachers are ideologically opposed to public sector unionism itself, as are the appellants in this case, one would think that compelling them to affiliate with the union by contributing to it infringes their First Amendment rights to the same degree as compelling them to contribute to a political party. *Id.* at 1811.

Defendants first contend that plaintiff has not shown that the operation of this agency shop agreement has infringed any of her First Amendment interests. They characterized this matter as purely a "pocketbook" dispute, not a dispute of constitutional dimensions. Plaintiff stated her position with respect to the payment of fees to the union in several letters of protest to union officials. In her letters of March 17, 1981 to Mr. Roberts (plaintiff's Exhibit 6) and to Mr. Huntine (plaintiff's Exhibit 27), and in her general letter of protest to the union (plaintiff's Exhibit 4), plaintiff clearly stated her position that she should not be required to pay the union any fee at all. In her April 9, 1981 letters to Mr. Eugene Glover (plaintiff's Exhibit 8) and to Mr. Roberts (plaintiff's Exhibit 9), plaintiff stated that she objected to the payment of any fees to the union because Indiana law prohibits agency shops for city or government employees.

Defendants, on the other hand, presented evidence tending to show that her refusal to pay any agency fees was based on economic considerations.[4] Yet, even if the Court

---

motion for preliminary injunction and in oral argument at the March 15, 1982 hearing. Since this issue has been litigated by the implied consent of the parties it will be treated as if it had been raised in the pleadings. Rule 15(b), Fed.R.Civ.P.

3. The Supreme Court's decisions in *Railway Employes' Dept. v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956) and *Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), provide background for the Court's decision in *Abood v. Detroit Bd. of Educ.*, 433 U.S. 915, 97 S.Ct. 2989, 53 L.Ed.2d 1102 (1977), but are not directly applicable here. In *Hanson*, plaintiffs objected to a union shop agreement where railroad workers had to become members of the union, not merely pay an equivalent fee, as a condition of employment. In *Street*, plaintiffs objected to the same union shop arrangement because the required fees were used to finance the campaigns of candidates whom they opposed, and to promote economic and political ideologies with which they disagreed. In this first argument, plaintiff is not contesting the uses to which her fees were put. Furthermore, in both cases the

Court was asked to interpret a specific section of the Railway Labor Act, Section 2, Eleventh, which permitted voluntary union-shop agreements in the private sector. Justice Powell's concurring opinion in *Abood* concluded, after a lengthy discussion of these cases, that the only clear holding of these cases is that Section 2, Eleventh, does not of itself violate the First Amendment. *Abood*, 97 S.Ct. at 1807.

4. Mr. Richard Knappenberger, the Secretary Treasurer for the union at the time of the subject events, called plaintiff in December of 1981 to tell her that she was six months behind on her dues and that if she didn't get caught up she would lose her job. He testified that she did not make any protest about the requirement of agency fees, but rather only complained that she did not have the money. (Transcript of Hearing, p. 228.) When asked about this conversation on cross-examination, plaintiff said that she could not recall making this statement, but she did say that she thought $13 per month for union dues was too much. (Transcript of Hearing, p. 83.) Furthermore, in payment of her initiation fees and initial dues

were to find from this evidence that plaintiff did in fact have economic reasons for refusing to pay, it could not find on the basis of all the evidence presented at this time that the economic reason was the only reason. Plaintiff's persistent letters protesting the payment of union fees and the use of her fees for political purposes show that she had her First Amendment rights in mind when she refused to pay. Although plaintiff's First Amendment interests in refusing to pay any fee at all might not have been developed to the degree that this Court would prefer, plaintiff has at least shown a high probability that she will be able to prove that the agency shop requirement of fees infringes on her First Amendment interests.

In *Abood*, after finding that the agency shop agreement on its face infringed upon First Amendment rights, the Court went on to consider the governmental interests that might be balanced against the First Amendment interests. The Court noted that in *Railway Employes' Dept. v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956) and *Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), the Court had already balanced the governmental interests against the First Amendment interests in the context of a union shop agreement authorized by the Railway Labor Act and found that "such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." [5] *Abood*, 431 U.S. at 222, 97 S.Ct. at 1793. In *Hanson* and *Street* the Court found this legislative assessment in the system of labor relations established by the Railway Labor Act. In *Abood*, as here, the assessment of governmental interest cannot come from the federal system of labor relations

because, under the National Labor Relations Act, the labor relations of state and local governments are left to the states. 29 U.S.C. § 152(2). The *Abood* Court found, however, that Michigan had established a system of labor relations for local government units modeled after federal law. Under the Michigan law the employees of local government units were given the right to organize and bargain collectively. A union supported by the majority of the employees in a given bargaining unit became the exclusive representative of those employees and was under the concomitant duty to fairly represent all employees in the unit, whether union members or not. In order to ensure that all the employees represented by the union fairly shared the financial burden of the union's duties as exclusive bargaining agent, the Michigan law authorized the agency shop clause at issue there.

In finding the agency shop agreement valid, the Court stated:

Our province is not to judge the wisdom of Michigan's decision to authorize the agency shop in public employment. Rather, it is to adjudicate the constitutionality of that decision. The same important government interests recognized in the *Hanson* and *Street* cases presumptively support the impingement upon associational freedom created by the agency shop here at issue. Thus, insofar as the service charge is used to finance expenditures by the Union for the purposes of collective bargaining, contract administration, and grievance adjustment, those two decisions of this Court appear to require validation of the agency-shop agreement before us. *Abood*, 431 U.S. at 224–226, 97 S.Ct. at 1794.

The Court further clarified its basis for upholding the agency shop agreement in the following passage:

plaintiff submitted two checks which were returned for insufficient funds. It was not until November 5, 1981, over eight months after plaintiff submitted the first check, that the union was paid this fee.

**5.** Although it may not be clear that *Hanson* and *Street* found First Amendment interests implicated by the forced contributions to the union

under the union shop agreement at issue in those cases, *see* concurring opinion of Justice Powell in *Abood*, 431 U.S. at 244–264, 97 S.Ct. at 1804–1813, it is clear that the Court in those opinions relied on the legislative determination that the authorization of such agreements was important to its system of labor relations.

[A]lthough Michigan has not adopted the federal model of labor relations in every respect, it has determined that labor stability will be served by a system of exclusive representation and the permissive use of an agency shop in public employment. As already stated, there can be no principled basis for according that decision less weight in the constitutional balance than was given in *Hanson* to the congressional judgment reflected in the Railway Labor Act. *Abood*, 431 U.S. at 229, 97 S.Ct. at 1796.

The above review of *Abood* shows that the Court permitted the infringement on First Amendment rights caused by the agency shop agreement because the Michigan legislature had determined that such agreements further the state's strong and legitimate interest in promoting just and peaceful labor relations. Without some such determination reflecting strong countervailing government interests, the agency shop agreement at issue there would not have survived constitutional scrutiny. If defendants cannot show that the State of Indiana has made a similar determination, the agency shop agreement here must fall.

In enacting Public Law 254, Acts of 1975 (codified at I.C. 22–6–4–1, *et seq.*), the Indiana legislature established a system for the regulation of labor relations between public employees and their governmental employers. Although it is not clear whether this law authorized agency shop agreements, it was derived in large part from the National Labor Relations Act and contained the familiar provisions of collective bargaining and exclusive representation. In 1977, however, the Indiana Supreme Court declared this law unconstitutional as violative of the Indiana Constitution. *Indiana Education Employment Relations Board v. Benton Community Schools Corporation*, 266 Ind. 491, 365 N.E.2d 752 (1977). Defendants have not alleged that any new law has been enacted to replace Public Law 254, and the Court has found none.

In the absence of any statute authorizing agency shop agreements, defendants have been able to cite only Fort Wayne's practice of entering into such agreements as proof of a state determination that they play an important part in the state's system of labor relations. The Supreme Court in *Abood*, however, clearly contemplated something more than the agreement itself to justify the infringement on First Amendment rights caused by it. In order to put some legislative weight behind these contracts, defendants argue that by virtue of the Indiana Home Rule Statute, I.C. 36–1–3–1 through 36–1–3–9, these agency shop agreements were authorized by state law and embody a determination that such agreements are important to Indiana's system of labor relations. The Supreme Court recently rejected a similar argument in *Community Communications Co., Inc. v. City of Boulder*, —— U.S. ——, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). In *City of Boulder*, the Court found that a municipality's action undertaken pursuant to its "Home Rule" authority is not action contemplated by the state and not an affirmative expression of state policy. Thus, it appears unlikely that defendants will be able to show a strong governmental interest to offset the infringement of First Amendment rights caused by the agency shop agreement.

On the basis of the evidence now before the Court, it appears likely that plaintiff will be able to show that the agency shop provision here infringes on her First Amendment rights, and it also appears unlikely that defendants will be able to show a sufficiently strong governmental interest to justify this infringement. The Court finds, therefore, that plaintiff has at least a reasonable likelihood of success on the merits.[6]

*II. Irreparable Harm.*

While the Court agrees with defendants' contention that the injury occasioned by

---

**6.** Since the Court has already concluded that plaintiff has a reasonable likelihood of success on the merits of her first claim challenging the validity of the agreement on its face, the Court need not consider the likelihood that she will succeed on the merits of her second claim that she has been improperly required to pay fees over the amount germane to collective bargaining purposes.

discharge from employment is usually not considered the type of harm that justifies injunctive relief, *Sampson v. Murray*, 415 U.S. 61, 91–92, 94 S.Ct. 937, 952–53, 39 L.Ed.2d 166 (1974); *Curtin v. Henderson*, 514 F.Supp. 16 (E.D.N.Y.1980), there is clearly much more involved here than plaintiff's loss of employment.

The facts of this case may be profitably compared to those presented in *Burns v. Elrod*, 509 F.2d 1133 (7th Cir. 1975), aff'd. sub nom, *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In *Burns*, former employees of the office of the Sheriff of Cook County brought an action seeking reinstatement on the ground that defendant had unlawfully discharged them on the basis of their political associations and beliefs. Finding that loss of employment did not constitute irreparable harm, the district court denied injunctive relief. In reversing the district court, the Court of Appeals for the Seventh Circuit noted that the heart of the case was not plaintiffs' loss of employment, but rather the violation of their First Amendment rights of free association. *Id.* at 1136. The situation presented here is strikingly similar. Plaintiff's discharge was merely the event which precipitated this lawsuit. She had long protested that the agency shop agreement at issue here violated her rights. Because plaintiff does not contend that she was improperly discharged under the terms of the agreement, but rather that the agreement itself is invalid as violative of her First Amendment rights, it is clear that First Amendment violations are at the heart of the action.

Having found that the agency shop agreement at issue here infringes on plaintiff's First Amendment rights it is clear that this element of the test is satisfied, for it is well settled that infringement on First Amendment rights, even for minimal periods of time, constitute irreparable injury justifying the grant of a preliminary injunction. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689 (1976); *Citizens for a Better Environment v. City of Park Ridge*, 567 F.2d 689, 691 (7th Cir. 1975); *Spartacus Youth League v. Board of Trustees*, 502 F.Supp. 789, 804 (N.D.Ill.1980).

### III.  Balance of Harm.

It is clear that the threatened injury to the plaintiff outweighs any harm the injunction might inflict on defendants. In addition to the threat of violation of plaintiff's First Amendment rights, plaintiff will be unemployed if the injunction does not issue. In contrast, defendants have not shown that the requested injunction would impose any hardship or injury on them. In fact, the City of Fort Wayne would probably suffer greater injury if the injunction were denied.

The evidence does not show, and defendants do not contend that plaintiff is an incompetent worker or that her services are not needed. On the contrary, defendants speak of the need for a replacement. Thus, the Court must conclude that plaintiff is a competent worker employed in a position that must be filled. If the injunction were not issued, the City would have to go through the expense and effort of hiring and training a new clerk while this action is pending. If plaintiff ultimately prevails on the merits, a result which this Court has already found likely, the City of Fort Wayne would be ordered to reinstate plaintiff, and all of the expense and energy spent on the replacement will have been wasted. If, however, the injunction were to issue and plaintiff ultimately lost on the merits, Fort Wayne would have had the benefit of a competent and experienced worker during the interim period, and could then seek a replacement without the threat that he or she might soon have to be discharged to allow for plaintiff's reinstatement.

The only harm that defendants have alleged is the harm the injunction might cause to the free and unfettered administration of the collective bargaining agreement. Since the Court has already found that this agreement is probably invalid, the Court cannot consider in this balance the effect of the injunction on its administration. Thus, the Court finds that the threatened injury to plaintiff outweighs the harm

the injunction might inflict on the defendants.

### IV. The Public Interest.

Defendants' only argument on this issue is also based on the enforcement of the agreement at issue here. Defendants argue that the public interest in furthering the goals of our national labor policy would be disserved by interfering in the administration of a collective bargaining agreement that furthers those goals. First, as the Court in *Abood* pointed out, the labor policies of state and local governmental units are not regulated by the National Labor Relations Act. *Abood*, 431 U.S. at 223, 97 S.Ct. at 1793, citing 29 U.S.C. § 152(2). Thus, the national labor policy does not apply here, and this agreement cannot be said to be in furtherance of that policy. Moreover, the Court has already found that this agreement is probably invalid on its face. The public interest cannot be disserved by failing to enforce such an agreement. Thus, the Court finds that the public interest will not be disserved by granting the injunction.

### V. Conclusion.

Having found that plaintiff carried the burden of persuasion on all the essential prerequisites to the issuance of a preliminary injunction, the Court finds that plaintiff is entitled to the requested relief.

Accordingly, it is ORDERED that:

1. Defendant, City of Fort Wayne, is hereby ENJOINED from conditioning plaintiff's employment on the payment of union dues or an equivalent "agency fee" as set forth in Article V of the Collective Bargaining Agreement between the defendants.

2. Defendant, City of Fort Wayne, shall REINSTATE plaintiff to her former employment with the same rights and privileges possessed by her prior to her termination.

3. This injunction is CONDITIONED upon plaintiff tendering to the Clerk of the Court during the pendency of this action an amount equivalent to the monthly fees or dues required under Article V of the Collective Bargaining Agreement between the defendants. Plaintiff is REQUIRED to tender these payments to the Court each month on or before the date that they would be required to be paid to defendant Local Lodge 2569 of the International Association of Machinists and Aerospace Workers, as determined by the rules and procedures of the union.