**FORT WAYNE EDUCATION ASSOCIATION, INC., Appellant
(Plaintiff Below),**

v.

**Mary E. ALDRICH, et al., Appellees
(Defendants Below).**

No. 02A03–8609–CV–255.

Court of Appeals of Indiana,
Third District.

Aug. 24, 1988.

Richard D. Darko, Janet C. Knapp, Lowe, Gray, Steele & Hoffman, Indianapolis, Frederick R. Tourkow, Tourkow, Crell, Rosenblatt & Johnson, Fort Wayne, for appellant.

William T. Hopkins, Jr., Gallucci, Hopkins & Theisen, Fort Wayne, David T. Bryant, Nat. Right to Work, Legal Defense Foundation, Inc., Springfield, Va., for appellees.

STATON, Judge.

The Fort Wayne Education Association, the exclusive bargaining representative for Fort Wayne School employees, brings this interlocutory appeal before us, contesting an injunction and judgment entered against it in favor of nonmember teachers, who contested contractual fair share fees by claiming, among other things, that such fees were used for political purposes, thus infringing on their first amendment rights.

We affirm in part and reverse in part.

The Fort Wayne Education Association (FWEA) exclusively represents the school employees of the Fort Wayne Community Schools (FWCS). A collective bargaining agreement between these two groups is embodied in a "Master Contract," which "contains certain terms and conditions of employment for teachers." (Master Contract, p. 4, Record p. 1152). This contract contains a "fair share clause," which requires that all school employees of the FWCS who are not members of FWEA pay a "representation fee" to FWEA and its affiliated organizations. This "fair share

fee" covers the costs incurred in collective bargaining activities on behalf of all school employees, union and non-union members. However, in accordance with Indiana law, FWEA cannot deduct the fee from teachers' paychecks unless the teachers voluntarily sign a release form.

In August of 1983, FWEA filed two complaints in an attempt to collect unpaid representation fees from certain non-member teachers for the 1981–82 and 1982–83 school years; the teachers answered the complaints by denying that they owed any representation fees, although they admitted that they were school employees of FWCS. The teachers filed counterclaims which alleged that FWEA was violating their constitutional rights by collecting and spending the non-members' representation fees for purposes unrelated to the duties of collective bargaining. The teachers also sought an injunction to prohibit FWEA from collecting such fees.

At the end of the trial, the jury returned a verdict awarding FWEA approximately 90% of the amount of the fees it sought to collect from the teachers.[1] Among the various motions and memorandum orders filed in connection with this case, the one in question is the "Memorandum Order, Findings of Fact and Conclusions of Law," entered on August 5, 1986, by the trial court. In this order, while the court again entered final judgment on the jury verdicts in favor of FWEA, it also entered an injunction and judgment against FWEA on the teachers' Counterclaims. Consequently, the following issues are now before us on interlocutory appeal:

## ISSUES

I. Whether the trial court erred in ruling on the adequacy of the rebate procedure?

II. Whether there is sufficient evidence to support the court's finding that the rebate procedure exacts association?

III. Whether the trial court entered an injunction prohibiting FWEA from collecting its representation fee?

IV. Whether the trial court erred by entering an injunction prohibiting FWEA from collecting a representation fee which included money for purposes other than collective bargaining?

V. Whether the trial court erred in ruling that the teachers have no means or opportunity to resolve disputes over the activities included in the fair share fee?

VI. Whether sufficient evidence supports the court's finding that the present year's fair share fee computations are based on the past year's fees?

VII. Whether the trial court erred by ruling that the jury's verdict signifies that the teachers prevailed on their counterclaims?

VIII. Whether the trial court properly ruled that the application of Article XXIII(G) impacts upon wages and working conditions, improperly delegating discretionary authority of the school board to FWEA, contrary to the *Goetz* decision?

IX. Whether the trial court properly ordered the IEERB to resolve disputes over the representation fees?

X. Whether the trial court erred by stating that the *defendants* admitted their list of chargeable expenses did not conform with those acceptable under court decrees?

XI. Whether sufficient evidence supports certain findings and conclusions of the trial court?

## STANDARD OF REVIEW

When we review the trial court's decision, we are to presume that the trial court

---

1. Whereas FWEA sought $215.89 for the 1981–82 school year and $235.62 for 1982–83 in representation fees, the jury verdicts found the proper amounts to be $193.50 and $211.50 respectively.

properly applied the law; the appellant has the burden of showing reversible error. *Abels v. Monroe County Educ. Ass'n* (1986), Ind.App., 489 N.E.2d 533, 540, *reh. denied,* (1986), Ind.App., 490 N.E.2d 775, *trans. denied, cert. denied,* (1987), 480 U.S. 905, 107 S.Ct. 1347, 94 L.Ed.2d 518. We will not set aside the specific findings and conclusions of the trial court unless the findings and conclusions are clearly erroneous. Finally, we will neither reweigh the evidence nor judge witness credibility, but we will consider the evidence most favorable to the trial court's decision, along with the inferences which can be reasonably drawn from the evidence. *Id.*

When reviewing the grant or denial of an injunction, an action within the discretion of the trial judge, we will reverse only where there is a clear showing of abuse, i.e., where the decision is contrary to the "logic and effect of the circumstances." *State v. Town of Wolcott* (1982), Ind.App., 433 N.E.2d 62, 65. We will not presume error but will entertain any reasonable presumption favoring the trial court's decision, and will affirm it on any valid legal theory. *Id.*

### *Article XXIII(G) & the Rebate Procedure*

The pertinent sections of Article XXIII(G) and FWEA's rebate procedure are as follows:

Article XXIII(G) reads:

G. REPRESENTATION FEE

1. The Board recognizes as valid, fair and equitable the Association's claim that all members of the bargaining unit, even those that are not members of the Association, have an obligation to pay fair value for services rendered on their behalf by the Association, by the Indiana State Teachers Association, and by the National Education Association, and for their proportionate part of the costs of collective bargaining, contract administration, grievance adjustment, and other

duties and services related to being exclusive representative.

2. The Board considers it proper for the Association to charge each non-member of the Association, who is also a member of the bargaining unit, and for each such non-member to pay to the Association a representation fee, to be determined solely by the Association but in a manner consistent with the services rendered and costs incurred on behalf of all bargaining unit members. Such representation fee may then be allocated between the Association, the Indiana State Teachers Association, and the National Education Association, as the Association shall deem appropriate.

3. On or before October 10, of each year, the Association shall provide the Board with a list of bargaining unit members who are not also Association members, and the Board shall ask each such person to voluntarily submit, within two (2) weeks, a payroll deduction authorization form, as set forth in the Appendix to this Contract. The Board shall then deduct the representation fee in ten (10) equal installments from the payroll of each person who submits an authorization. The Board shall inform the Association of all members of the bargaining unit who refuse to sign such an authorization form or who revoke an executed form.

4. The Association, on its own and not on behalf of the Board, may take such action as it may deem appropriate to collect its representation fee from those bargaining unit members who refuse to authorize payroll deductions for or who otherwise refuse to pay the representation fee.

Plaintiff's Exhibit 1, pp. 50–51, Record, p. 1152.

The pertinent sections of FWEA's rebate procedure[2] are as follows:

FORT WAYNE EDUCATION ASSOCIATION, INC. SERVICE (REPRESENTATION) FEE REBATE POLICY

\*　　\*　　\*　　\*　　\*　　\*

---

**2.** Since ISTA's policy is identical and NEA's is similarly worded, in the interest of space we provide only FWEA's policy. For a verbatim

reading of all three policies, please see issue II, *infra.*

Procedure

Section 1.A. Any person required by Contract or statute to pay a service fee to the Fort Wayne Education Association, and who objects to the expenditure of any portion of his service fee for political activities may request a rebate of that portion of his service fee.

\* \* \* \* \* \*

Section 4.A. Not later than ten (10) days after the close of each fiscal year the Executive Committee of the Fort Wayne Education Association shall determine the *amount of the service fee rebate, which shall be equal to the proportion of service fees expended for political activities in that fiscal year....* (Emphasis added.)

\* \* \* \* \* \*

Plaintiff's Exhibit 17; Record, p. 2452.

From these excerpts, two conclusions are evident, conclusions which are pertinent to our decision. First, pursuant to the contract, FWEA requests teachers to voluntarily allow FWEA to start deducting the representation fee in *October* of the year for which it is due, *prior* to the incurring of all costs and rendering of all services.

Second, the verbiage of the rebate policy indicates that its purpose is to refund that portion of the nonmember teachers' funds spent for political purposes. This, in turn, signifies that FWEA is aware of and anticipates that its method of collecting the fee necessarily entails that part of it is or may be spent for political purposes.

## I.

### *Rebate Procedure*

As stated above, the standard of review requires that we look to the evidence favorable to the judgment and uphold the trial court's findings and conclusions unless they are clearly erroneous. *Abels, supra,* at 540.

█ FWEA asserts the trial court erred in ruling on the adequacy of the rebate procedure, contending that this was not an issue in the case, and while the procedure was voluntary, none of the teachers used it. However, in so arguing, FWEA overlooks the fact that this question was raised in several of the counterclaims before the court, as well as in the answer to the plaintiff's complaint.[3] FWEA also ignores the nature of the rebate procedure, which makes its voluntariness irrelevant.

### *Review of Rebate Procedure*

The defects of the rebate procedure account for many of the infringements of rights asserted by the defendants in their answer and counterclaims. In one of the defendants counterclaims, it appears that the plaintiffs "knew or should have known that the amount of the service fee did not accurately reflect a nonmember's *pro rata* share of Plaintiff's costs of collective bargaining" which could legally be charged (Record, p. 126). The counterclaim and defense also state that collecting and expending money for purposes other those related to collective bargaining would deprive him of his constitutionally protected rights of Freedom of Speech and Freedom of Association. Finally, the counterclaim asserts that "they cannot be required to pay fees in excess of that portion of membership dues which is retained by the Plaintiff." (Record, p. 123).

The counterclaim and defense of another defendant, Nelson Eddy, state that the plaintiff did not perform its condition precedent to collecting the fee, i.e., providing an accounting which would allow Eddy to determine his fair share. Eddy also objected to his money being spent for political purposes during the time FWEA was determining the amount so spent, a method made evident by the rebate procedure.

In so far as these statements in the counterclaims allege that FWEA spent its funds for political purposes, the rebate procedure was properly an issue before the court, because the rebate procedure indicates that FWEA spent nonmembers'

---

3. We also note that the plaintiffs themselves offered the Rebate Procedure into evidence, in part, in an attempt to show that they provided the requisite accounting, or at least that they offered to provide one. Record, p. 1942, 2452–2456, Exhibits 17–22.

funds for political purposes. Not only was the rebate procedure FWEA's attempt at rectifying its spending of nonmembers' money for political purposes; the rebate procedure is the result of FWEA's assumption that the money was so spent.

### Finding the Procedure Inadequate

■ As described in the rebate procedure, FWEA established a system under which teachers could request a refund of that portion of the collected fees which FWEA later found to have been used for political purposes. Under the section entitled "Procedure," the FWEA's Fee Rebate Policy reads as follows:

> Section 1.A. Any person required by Contract or statute to pay a service fee to the Fort Wayne Education Association, and who objects to the expenditure of *any portion of his service fee for political activities may request a rebate of that portion* of his service fee. (Emphasis added.)

Plaintiff's Exhibit 17, Record, p. 2452. It is clear to anyone who reads this section that the fee collected includes a portion which will be used for political purposes. Such usage was strictly prohibited by *Abels, supra,* at 538 and 539, and *New Prairie Classroom Teachers Ass'n v. Stewart* [*Stewart II*] (1986), Ind.App., 487 N.E.2d 1324, 1327–28, *reh. denied, trans. denied, cert. denied, Stewart v. New Prairie Classroom Teachers Ass'n* (1987), 480 U.S. 917, 107 S.Ct. 1370, 94 L.Ed.2d 686.

Moreover, the fact that the procedure is voluntary merely obscures an already dismal picture. For, according to the rebate procedure, the political portion is not automatically refunded but must be requested according to a stringent procedure; only by complying with precise terms of the procedure can teachers recoup funds wrongfully collected from them. Even then, the amount to be returned is only released after the representational and political fees have been paid.[4] Thus, as asserted by the defendants in their counterclaims, the

plaintiffs knew or should have known that they were collecting and expending money used for purposes other than collective bargaining. If the share collected included money spent for political purposes, the collected share cannot be said to reflect the *pro rata* share of the collective bargaining fees which the plaintiffs are entitled to collect. Thus, the nature of the rebate procedure precludes it from being an acceptable method for collecting fair share fees from non-member teachers.

Precedent also supports the trial court's finding that the rebate procedure is inadequate. In *Chicago Teachers Union v. Hudson* [*Hudson*] (1986), 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232, the United States Supreme Court used the reasoning of its earlier decisions to condemn a rebate procedure.

> [A]s in *Ellis,* [*v. Brotherhood of Railway* (1984), 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428], a remedy which merely offers dissenters the possibility of a rebate does not avoid the risk that dissenters' funds may be used temporarily for an improper purpose. "[T]he Union should not be permitted to exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining." *Abood,* [*v. Detroit Bd of Educ.* (1977), 431 U.S. 209, 244, 97 S.Ct. 1782, 1804, 52 L.Ed.2d 261, *reh. denied,* 433 U.S. 915, 97 S.Ct. 2989, 53 L.Ed.2d 1102], (concurring opinion).... [W]hatever the amount, the quality of respondents' interest in not being compelled to subsidize the propagation of political or ideological views that they oppose is clear.... *A forced exaction followed by a rebate equal to the amount improperly expended is thus not a permissible response to the nonunion employees' objections.* (Emphasis added.)

*Hudson, supra,* 106 S.Ct. at 1075.

The issue before the court in *Hudson* is not identical to that before us today. The

---

4. FWEA's Rebate Policy reads, in part:
   Section 4.B. Not later than thirty (30) days *after the close of a fiscal year* an amount equal to the rebate determined by the Board, together with eight percent (8%) simple interest, shall be sent to those eligible persons who requested a rebate. (Emphasis added.)
   Plaintiff's Exhibit 17, Record, p. 2452.

*Hudson* opinion addressed fair share fee requirements under Illinois law, where involuntary payroll deductions are not forbidden. Thus, FWEA argues, the procedures required by *Hudson* to safeguard nonmembers' rights cannot be said to apply where the fee is voluntarily given.

Although Indiana forbids both involuntary payroll deductions and making the representation fee a condition of employment, the word "voluntary" ascribed to Indiana's system is misleading. The requirement that payroll deductions be voluntary does not make the payment itself voluntary. While not a condition of employment, Indiana's nonmember teachers are required, under Indiana law and the terms of the Master Contract, to pay the fee. Thus, with or without voluntary payroll deductions, the payment is mandatory. Consequently, since the payment is not voluntary, the rights of Indiana teachers are no less infringed upon than their Illinois counterparts. Therefore, we hold today that the nonmember teachers are entitled to the protections announced in the *Hudson* decision.

Our denial of rehearing for *Abels*, 490 N.E.2d 775, foreshadowed this result. Although that case did not address the procedures for collecting a fair share fee, in dicta we stated that in such a situation, the principles announced in *Hudson* would apply, despite Indiana's requirement that any payroll deduction be voluntary.

> While this court is clearly bound to apply the constitutional limitations announced in *Chicago Teachers Union* [*v. Hudson*] where internal union procedures for the collection of fair share representation fees are challenged, that issue is not now before us.

*Abels, reh. denied,* (1986), Ind.App., 490 N.E.2d 775. For the reasons stated above, any method for collecting a fair share fee from non-members must comply with the limitations and principles found in *Hudson.*

Thus, as the rebate procedure allows funds to be used for political purposes and contradicts the principles announced in *Hudson,* the rebate procedure is constitu-

tionally inadequate. Therefore, the trial court properly addressed the rebate procedure.

## II.

### *Exacting Association*

■ FWEA further defends the legitimacy of its rebate procedures by questioning the trial court's finding that:

> [T]he rebate procedure, even if it is pursued, exacts association from objecting non-members, albeit brief or temporary the exaction may be. (Citation omitted.)

Findings of Fact & Conclusions of Law, Record p. 1009. Although FWEA protests, asking, "How could the teachers be forced to associate by using the rebate procedures when they did not use those procedures?" (Appellant's Brief, p. 47.), according to the trial court, the rebate procedure exacted association regardless of whether it was used or not. The rebate procedure itself offers sufficient evidence to support this finding.

Pursuant to the rebate procedure used by FWEA and ISTA,

> [a]ny person ... who objects to the *expenditure* of any portion of his service fee for *political activities* may request a *rebate of that portion* of his service fee. (Emphasis added.)

FWEA, Inc., Service (Representation) Fee Rebate Policy, Exhibit 17, Record p. 2452; Indiana State Teachers Association Service (Representation) Fee Rebate Policy, Exhibit 21, Record, p. 2455. Similarly, NEA's "Political Activity Rebate" reads:

> A nonmember ... is eligible to receive a rebate of that portion of the fee *which otherwise would be used* by the NEA *for political activity.* (Emphasis added.)

NEA, Political Activity Rebate, Exhibit 19, Record, p. 2453.

These portions of the rebate procedures indicate that part of the teachers' money is used for political purposes. Although the procedures give teachers the opportunity to recoup their money, this cannot happen unless and until they request the rebate.[5]

---

5. In fact, the Rebate Procedures were not even posted until October 20 for the 1981–82 school

Even if they request a return of their money via the stringent requirements for doing so, their money will not be returned until the end of the year. Thus, through the use of a part of their money, they are supporting political ideas which, in effect, forces them to "associate with the union." *Abood, supra,* 431 U.S. at 237, n. 35, 97 S.Ct. at 1800, n. 35. For, as summarized by the United States Supreme Court:

> By paying a larger share of collective bargaining costs the nonmember subsidizes the union's institutional activities.

*Id.*

As was made clear in *Abood,* the United States Supreme Court has continually condemned forced association. Indiana courts have condemned forced association too. In condemning forced association, one of our own prior decisions relied upon the following passage from *Abood:*

> "Our decisions establish with unmistakable clarity that the freedom of an individual to associate for the purpose of advancing beliefs and ideas is protected by the First and Fourteenth Amendments." [Citations omitted.] Equally clear is an individual's right of choice not to associate himself with a particular organization or ideology.

*Fort Wayne Educ. Ass'n, Inc. v. Goetz* [*Goetz*] (1982), Ind.App., 443 N.E.2d 364, at 368, quoting from *Abood, supra,* 431 U.S. at 238, 97 S.Ct. at 1798. We find no reason to veer from this well-marked course.

Thus, since the rebate procedures force teachers to associate by using part of their fees for political purposes, regardless of whether these procedures are used, we find no error in the court's finding that the teachers were forced to associate.

### III.

#### *Prohibited Collection*

According to its interpretation of the court's order, FWEA claims that the trial court erroneously enjoined FWEA from col-

year and January of 1983 for the 1982–83 school year, even though FWEA sought payroll deduc-

lecting the representation fee. Since we discuss whether the injunction was proper in the next section, we now address only whether the injunction actually prohibited collection of the fair share of the representation fee.

In contesting the court's ruling, FWEA states:

> In fact the trial court issued an injunction which states that FWEA is enjoined "from collecting and instituting suit to collect" the representation fee. (R. 1010.)

Appellant's Reply Brief, pp. 11–12.

Since this question arises from FWEA's selective reading of the court's ruling, we include the paragraph in question in full:

> Plaintiff is enjoined from collecting and instituting suit to collect from Defendants *any part of the representation fee which exceeds the proportionate part of the fair value of services rendered* on their behalf by the Plaintiff, the Indiana State Teachers Association (ISTA) and the National Education Association (NEA) and which constitutes the costs so incurred as incidental activities of collective bargaining, contract adminstration [sic], grievance adjustment and other expenses which are not reasonably related and germane to said activities within the bargaining unit. (Emphasis added.)

Order of Relief and Injunction, August 5, 1986, Record p. 1010.

In essence, the order only prohibits FWEA from collecting that part of the representation fee which is spent for political expenditures. The order does not prevent FWEA from collecting its fair share fee to cover the costs of collective bargaining, the fee which it is legally entitled to collect.

Further, despite FWEA's heroic attempts at refocusing the court's holding, the order allows NEA and ISTA to obtain their percentage of non-members' fees, thus complying with the decisions in *Abels* and *Stewart II.*

tions as early as October 10 of each year.

## IV.

### The Injunction

■ FWEA's assertion that injunctive relief is improper must fail. The First Amendment's Freedom of Association includes the freedom *not* to associate, *Goetz, supra,* at 368, which, in turn, includes the right not to be required to support political aspects with which one desires not to be associated. *Abood v. Detroit Board of Education* (1977), 431 U.S. 209, 234–35, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261, *reh. denied,* (1977), 433 U.S. 915, 97 S.Ct. 2989, 53 L.Ed.2d 1102.

In *Perry v. City of Fort Wayne* (N.D. Ind.1982), 542 F.Supp. 268, the U.S. District Court for the Northern District of Indiana stated the extent to which First Amendment rights must be protected. Addressing the propriety of an injunction, the court stated:

> it is well settled that infringement on First Amendment rights, even for minimal periods of time, constitute [sic] irreparable injury justifying the grant of a preliminary injunction. (Citations omitted.)

*Perry, supra,* at 274. See also, *Elrod v. Burns* (1975), 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547; *Libertarian Party of Indiana v. Packard* (7th Cir. 1984), 741 F.2d 981, 985.

Here, the trial court properly ordered an injunction prohibiting the "infringement on First Amendment rights." As discussed in Issue I, the Rebate Procedure indicated that the collected fees were used for political purposes, i.e., a usage beyond the costs of collective bargaining. As stated in our discussion of Issue II, pursuant to *Abood, supra,* 431 U.S. at 234 and 237, n. 35, 97 S.Ct. at 1799 and 1800 n. 35, collecting a fee which encompasses more than the costs of collective bargaining is an infringement on First Amendment rights. Under *Perry,* such an infringement is within the scope of preliminary injunctions. Thus, the court did not err in enjoining FWEA from collecting that portion of the representation fee which accounted for costs beyond those required for collective bargaining purposes.

## V.

### Dispute Mechanisms

■ FWEA asserts that the trial court erred in finding that the

> Defendants had no means or opportunity to resolve disputes concerning nonchargeable items of expense....

Order of Relief and Injunction, August 5, 1986, Record, p. 1004.

FWEA bases its claim on the following theory which it presents to this court:

> Involuntary deduction of the representation fee triggers a need for procedural safeguards to protect the teachers' interests. *Chicago Teachers Union, Local No. 1 v. Hudson* (1986), [475] U.S. [292], 106 S.Ct. 1066 [89 L.Ed.2d 232]. Absent involuntary deduction of the fee, there is no taking of property to trigger the need for procedural safeguards.

Appellant's Brief, p. 43. In so far as the United States Supreme Court addressed the adequacy of an Illinois involuntary payroll deduction plan, *Hudson* may support the first contention in FWEA's argument above. However, the truth of a statement does not imply the statement's converse will be true. The adequacy of "voluntary payroll deduction" plans never arose in the *Hudson* decision. In pertinent part, the United States Supreme Court stated:

> We hold today that the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a *reasonably prompt opportunity to challenge the amount of the fee* before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending. (Emphasis added.)

*Hudson, supra,* 106 S.Ct. at 1078.

In Issue I, we have already held that the *Hudson* requirements apply to Indiana's fair share fee, since these payments are not voluntary. As there was no evidence of the existence of procedural safeguards before the court, and FWEA failed to point to any, the court did not err in holding that

the Defendants lacked the means to resolve disputes over non-chargeable items.

## VI.

### *Last Year's Fees = Basis*

■ FWEA further defends its fee collecting procedure by claiming that the fees were not prospectively based, contrary to the court's findings. Nonetheless, testimony, the rebate procedure, and Article XXIII(G) conclusively support the trial court's finding that

the fee is charged prospectively and, on the basis of the expenditure experience of the previous year last past,....

Order of Relief and Injunction, August 5, 1986, Record p. 1005.

FWEA attempts to support its position by referring to the fact that the suit was *filed* at the conclusion of the 82–83 year and that the evidence *at trial* accounted for FWEA's expenditures made during 81–82 and 82–83. However, FWEA's reliance on trial evidence for its support is of no avail, because the pertinent question is not whether FWEA could account for its expenditures at trial, or even after the school year ended. Rather, the pertinent question is whether FWEA could account for its expenditures and the fees it sought to collect from nonmembers on October 10th, when the teachers were asked to sign voluntary deduction forms.

The testimony of Dale Harris, Executive Director of ISTA from 1980–84, revealed the following:

In the Fall it [FWEA] establishes the dues for the following year. So you know what it is as you build that budget. In the Spring when you build the budget you know what the dues are going to be for the following year, you know what the membership is this year and so therefore you make that assumption. (Emphasis added.)

Record, p. 1910, ll. 9–16. The testimony of Marvin Ross, ISTA UniServ Director serving FWEA and Executive Director of FWEA, coincides with that of Harris:

... the FWEA, their budget, ..., was adopted in the spring, and the dues, both

the dues and fair share fees, were set, well, the dues are set in the spring with the budget and the fair share fee set in August. There was no adjustment made after that point in time....

Marvin Ross, Direct Examination, Record, p. 2439. This testimony offers ample evidence that the fees were set according to the prior year's expenditures.

The rebate procedure also indicates that representation fees were calculated prior to costs being incurred and services rendered. In pertinent part, the rebate procedure reads:

Section 4.A. ... the Executive Committee of the Fort Wayne Education Association shall determine the *amount of the service fee rebate*, which *shall be equal to the proportion of service fees expended for political activities in that fiscal year.* (Emphasis added.)

FWEA, Inc., "Service (Representation) Fee Rebate Policy, Exhibit 17, Record p. 2452"; Indiana State Teachers Association, "Service (Representation) Fee Rebate Policy, Exhibit 21, Record p. 2455". As discussed earlier, NEA has a similar policy which offers a rebate of that portion of the service fee spent for political purposes.

In so far as the rebate procedures provide for the refund of costs expended for political purposes, one can only conclude that FWEA did not know these costs at the time it requested the fees. Had FWEA calculated the service fee after its expenditures were made, FWEA would know the amount of its political costs and be able to exclude them from the fee. Thus, while the rebate procedure does not indicate that FWEA used last year's fees as its basis, the procedure does indicate that the fees are collected before expenditures are made.

Finally, Article XXIII(G) also offers evidence that the fee is based on prospective figures. Paragraph 3 of this Article reads:

On or before October 10, of each year, ... the Board shall ask each such person [nonmember] to voluntarily submit, within two (2) weeks, a payroll deduction authorization form,.... The *Board shall then deduct the representation fee in ten (10) equal installments* from the

payroll of each person who submits an authorization.... (Emphasis added.)

Article XXIII(G) of the Master Contract, paragraph 3, Exhibit 1 at pp. 50–51, Record p. 1152. As the deductions are made throughout the year, not at the year's completion, when expenditures can be tallied, Article XXIII(G) asks that teachers permit deductions before, or, at best, simultaneously with, the completion of FWEA's expenditures.

Therefore, given the testimony of Dale Harris and Marvin Ross, the nature of the rebate procedures, and the wording and operation of Article XXIII(G), there was sufficient evidence before the trial court to support its finding that the fees were prospectively based.[6]

## VII.

### Teachers' Counterclaims

■ FWEA asserts that the trial court erred in its holding which states that because the jury returned a verdict awarding FWEA less than the amount it sought as a representation fee, the teachers prevailed on their counterclaims. In so arguing, FWEA relies on three (3) assignments of error:

(1) that a verdict awarding FWEA less than the amount it sought implied the teachers prevailed;

(2) that it was not possible for FWEA to impermissibly use the fees, because FWEA had never collected any fees; and

(3) that FWEA's method of collecting the fees violated teachers' constitutional rights, even though its costs were incurred and services provided prior to filing a complaint.

(Appellant's Brief, pp. 18–19).

Although FWEA makes various attempts at supporting its assertion, these attempts are marred by two flaws which permeate FWEA's rationale. First, FWEA assumes that it included only assessable expenses in the fees it sought to collect from the non-member teachers. Since the rebate procedure provides for a refund of that portion of the fee collected and used for political purposes, which is a non-assessable expense, FWEA's assumption is incorrect.

The second flaw in FWEA's argument occurs when FWEA interchanges the fee due it under the contract with the court-ordered fee obtained via jury verdict. The two are not the same—the distinction is crucial. The teachers challenged the representation fee FWEA sought to collect pursuant to the master contract; consequently, their counterclaims are not aimed at the propriety of the court-ordered fee. In fact, the trial court itself found: "The harm which requires redress pre-exists the discretionary step to the Courthouse to enforce Article XXIII(G) in the courts." Order of Relief and Injunction, August 5, 1986, Record p. 1009. By intermingling two different fees, FWEA misconstrues the teachers' true complaint.

Aside from FWEA's two misconceptions as described above, none of FWEA's three assignments of error supports its contention that the trial court erred by ruling that the teachers prevailed on their counterclaims. Addressing FWEA's Assignments of Error in reverse order, we note that the third Assignment of Error listed above, whether FWEA's costs were incurred and services were rendered prior to the filing of the complaint, is irrelevant. The teachers challenged the amount which FWEA sought to collect as a fee in October, via voluntary payroll deductions. It was this fee which the teachers argued included improper amounts and violated their constitutional rights; it was also this fee to which the rebate procedure applied.

---

**6.** We find only that the trial court was correct in ruling that the fees were prospectively based. We do not address the propriety of basing this year's fees on past figures, since this question was not before court. However, we note that the Supreme Court stated:

We continue to recognize that there are practical reasons why "[a]bsolute precision" in the calculation of the charge to nonmembers cannot be "expected or required." [Citation omitted.] Thus, for instance, the Union cannot be faulted for calculating its fee on the basis of its expenses during the preceding year.
*Hudson, supra,* 106 S.Ct. at 1076, n. 18.

The teachers disputed this fee in October, when they refused to sign the payroll deduction release forms. At that time, FWEA's costs and services for the whole year could not have been incurred and rendered, even though Article XXIII(G) authorized FWEA to collect a fee "in a manner consistent with the services rendered and costs incurred on behalf of all bargaining unit members." (Emphasis added.) (Article XXIII(G), Exhibit 1, pp. 50–51, Record p. 1152). The filing of the complaint occurred after the fact and as a result of the contention over the propriety of the October fee.[7]

FWEA's second assignment of error is also without merit. FWEA did collect some fees, even if only partial amounts, and the rebate procedures show that part of the collected fees was used or could be used for political, i.e., impermissible purposes.

FWEA admits that some fees were paid, at least in part, in its complaint:

Certain of the individual Defendants have made partial payment to Plaintiff for their fair share or representation fee, either through payroll deductions or through direct payments to Plaintiff. (Emphasis added.)

Plaintiff's Complaint for Damages, p. 4, Record p. 11. This statement is supported by a list which shows the amounts owed by each nonmember teacher.

As one of the Plaintiff's witnesses explained the meanings behind the numbers on the list of amounts owed by the teachers, this witness simultaneously testified that some payments had been made. During direct examination, Marvin Ross, UniServ Director serving FWEA and Executive Director of FWEA, testified as follows:

In 81–82 she [a nonmember teacher] paid the full membership so there is no charge for 81–82. Then in 82–83 she paid one or two payroll deductions toward membership again and then sent in a cancellation to the Payroll Department of the Fort Wayne Community Schools and cancelled out and said she would not pay any more.

\*   \*   \*   \*   \*   \*

Well, that [nonmember] teacher started paying membership dues each of the two years and after a deduction or two or three wrote into the Payroll Department and simply cancelled out, and that is the balance owed for that year.

Record, pp. 2480, 11. 20–26; p. 2481, 11. 12–16.

The record confirms these statements. The Plaintiffs responded to Defendants' Interrogatory # 11 by stating that eleven (11) nonmember teachers paid the representation fee during the 1981–82 school year, while thirty (30) paid the 1982–83 fee during that school year. Additionally, since August 1, 1981, one (1) full-time nonmember teacher and ten (10) part-time nonmember teachers paid the 1981–82 fees, while twenty-three (23) full-time and seven (7) part-time nonmember teachers paid the 1982–83 fees. Thus, in so far as some partial fees were collected for the years in question, fees which included or could include impermissible political costs, the court's ruling is not amiss, and FWEA's second assignment of error must fail.

Before addressing FWEA's third assignment of error, two of FWEA's corollary arguments warrant discussion. Both fall short of their objectives. FWEA theorizes that the trial court ignored Stewart II and Abels, arguing that Stewart II rejected the application of Hudson to the collection of representation fees and that, in Abels and Stewart II, the teachers challenged the method of calculation to the U.S. Supreme Court, where certiorari was denied.

First, it is clear that Stewart II rejected the Seventh Circuit Hudson decision, (Hudson v. Chicago Teachers Union (7th Cir. 1984), 743 F.2d 1187), as support for a method of calculation. In pertinent part,

7. For this same reason, we find no merit in FWEA's corollary argument, i.e., that FWEA cannot collect a fee including improper amounts, because it cannot collect funds until the court determines the proper amount. This also confuses the two "fees" sought by FWEA. Again, the fee FWEA requested in October is not equivalent to the court-determined fee. Indeed, if none protested the October fee, no court-ordered fee would ever result.

the paragraph FWEA sought to rely on from *Stewart II* reads as follows:

> The teachers cite a 7th Circuit case, *Hudson v. Chicago Teachers Union Local No. 1* (1984), 743 F.2d 1187, *cert. granted,* [472] U.S. [1007], 105 S.Ct. 2700, 86 L.Ed.2d 716 (U.S.1985), *to support their suggested method of calculation....* *Hudson* does not provide the support the teachers seek.... The trial court did not err in basing the representation fee on regular dues less an amount spent on political or ideological activities unrelated to NPCTA's duties as an exclusive representative. (Emphasis added.)

*Stewart II, supra,* at 1328–29. Thus, contrary to what FWEA would lead us to believe, *Stewart II* rejected *Hudson (7th Cir.)* as support for the *method of calculation,* not the *procedure for collecting* representation fees.[8]

Second, in *Stewart II* and *Abels,* the *method of calculation* was challenged, not the *procedure for collecting* the fee. Thus, while the U.S. Supreme Court did deny certiorari for both *Stewart II* and *Abels,* that denial did not pertain to the procedure for collecting the fee. Therefore, as FWEA asserts, FWEA does have the right to require a representation fee in an amount "that is consistent with the method of calculation approved by this Court in *Abels* and *Stewart II.*" (Appellant's Brief at 26). However, we note that both cases prohibit the inclusion of political fees, a rule which FWEA seems to have ignored.

Finally, we find no merit in the first assignment of error listed above, i.e., that the lesser verdict returned by the jury does not indicate that the teachers prevailed on their counterclaims; we fail to see how the court could hold otherwise.

Among other things, the counterclaims alleged that

> At the time that the amount of the service fee was decided upon, Plaintiff, ..., knew or should have known that the amount of the service fee did not accu-

rately reflect a nonmember's *pro rata* share of Plaintiff's costs of collective bargaining, ...

Answer to Complaint for Damages and Counterclaim for Damages, Record, pp. 135–136. Thus, the counterclaims alleged that FWEA sought a representation fee in excess of its allowable charges.

The rebate procedures indicate that a portion of the fee is or could be used impermissibly, i.e., for political purposes. The jury awarded FWEA a lesser fee than it requested. Since the standard of review requires that unless the specific findings and conclusions are clearly erroneous, we cannot disturb them, *Abels, supra,* at 540, we cannot say that the court's conclusion is clearly erroneous.

## VIII.

### School Board Power

■ FWEA correctly asserts that the trial court's finding, i.e., that Article XXIII(G) delegates the school board's discretionary power to FWEA, is erroneous and contrary to the decision in *Goetz,* which upheld the validity of that article.

Verbatim, the trial court found as follows:

> The application of Article XXIII(G) impacts upon wages and working conditions and, in this regard, the discretionary authority of the board is delegated to the Plaintiff [1] to manage an aspect of the employment relationship with nonmember-employees such as these Defendants. See, *Fort Wayne Education Association v. Goetz* (1982), [Ind.App.,] 443 N.E.2d 364, 371.

---

[1] The Court of Appeals in *Goetz,* at 373 held only that the Fort Wayne Board and the Association had the statutory power to negotiate Article XXIII(G).

Order of Relief and Injunction, August 5, 1986, Record pp. 1003–1004, and p. 1004, n. 1.

The passage in *Goetz* which upheld Article XXIII(G) reads as follows:

> Indiana does not undermine the *Abels* and *Stewart II* decisions.

---

**8.** Although the U.S. Supreme Court's *Hudson* opinion did address the procedure for collecting the fee, holding that its requirements apply in

After searching inquiry into the pertinent cases and Indiana statutes, we hold the Fort Wayne Board and the Association had the power to negotiate the agency shop clause in question, *which clause recognized nonmember teachers' responsibility to pay a representation fee to the Association and did not delegate or abridge the Board's discretionary authority* to manage the employment relationships with such nonmembers. (Emphasis added.)

*Goetz, supra,* at 373.

While *Goetz* recognized the authority of the Association to *negotiate* Article XXIII(G), from the words emphasized above it is apparent that *Goetz* approved of the clause itself. We do not construe approval of the clause in *Goetz* to apply to its verbiage alone, but we read such approval as encompassing its implementation as well, thus precluding us from finding a delegation of authority inconsistent with Indiana case law.

Approval of Article XXIII(G) is consistent not only with *Goetz*, but also with Indiana Code § 20–7.5–1–1 et seq., known as the Collective Bargaining Statute, (CEEBA). In *Anderson Fed'n of Teachers v. Alexander* (1981), Ind.App., 416 N.E.2d 1327, we explained CEEBA's delegation and reservation of powers as follows:

The scope of collective bargaining by schools, then, is to be restricted because school corporations have duties to the public, to the legislature, and to their employees as individuals, which they must not be permitted to bargain away. These strictures are made concrete in sections 3 through 6 of the Act. Section 3 of the Act requires that school corporations and teachers bargain collectively on pay, pay-related fringe benefits, hours, and grievance procedures; and authorizes them, by mutual consent, to contract as to various methods relating to teaching as a profession. I.C. 20–7.5–1–3, –5. But the crucial portion of section 3 forbids the parties to agree to any provision in conflict with either the "rights" of the parties as outlined in section 6 of the Act, or the rights of any person under federal or state law.

An inspection of section 6 discloses that while section 3 protects the *rights* of school employees, school employers are protected not in their *rights*, but in their *responsibilities and authority.* I.C. 20–7.5—1–6. So the legislature has plainly expressed its intent that the responsibilities and authority of school corporations, as partially described in section 6(b) of the Act, are duties entrusted by the legislature to the sole discretion of school corporations, and can not be restricted in a collective bargaining agreement. (Emphasis in original.) (Footnote omitted.)

*Anderson, supra,* at 1331–1332.

Looking at the pertinent sections of CEEBA as addressed in *Anderson, supra,* it is apparent that both "wages" and "working conditions" are within the scope of collective bargaining and not within the "sole discretion" of the school board pursuant to IC 20–7.5–1–1.

CEEBA lists the duties of school employers [9] as follows:

(b) School employers shall have the responsibility and authority to manage and direct in behalf of the public the operations and activities of the school corporation to the full extent authorized by law. Such responsibility and activity shall include but not be limited to the right of the school employers to:

(1) Direct the work of its employees;

(2) Establish policy;

(3) Hire, promote, transfer, assign and retain employees;

(4) Suspend or discharge its employees in accordance with applicable law;

(5) Maintain the efficiency of school corporations;

(6) Relieve its employees from duties because of lack of work or other legitimate reason;

(7) Take actions necessary to carry out the mission of the public schools as provided by law. [References omitted.]

9. IC 20–7.5–1–2(c) defines "school employer."

IC 20–7.5–1–6(b). This section does not set aside "wages" and "working conditions" as subjects exclusively within the power of the school board.

Furthermore, under sections 20–7.5–1–3, –4, and –5, "wages" and "working conditions" are within the realm of collective bargaining.

> On and after January 1, 1974, school employers and school employees shall have the *obligation and the right to bargain collectively* the items set forth in section 4 [20–7.5–1–4], the right and obligation to *discuss* any item set forth in section 5 [20–7.5–1–5], and shall enter into a contract embodying any of the matters on which they have bargained collectively. No contract may include provisions in conflict with ... school employer rights as defined in section 6(b) [20–7.5–1–6(b) ] of this chapter.

IC 20–7.5–1–3. Sections 4 and 5 read as follows:

> 20–7.5–1–4. Subjects of bargaining.—A school employer *shall bargain collectively* with the exclusive representative on the following: salary, *wages*, hours, and salary and wage-related fringe benefits.... (Emphasis added.)
>
> 20–7.5–1–5. Subjects of discussion.—(a) A school employer shall discuss with the exclusive representative of certified employees, *and may* but shall not be required to *bargain collectively*, negotiate or enter into a written contract concerning or be subject to or enter into impasse procedures on the following matters: *working conditions*, other than those provided in section 4 [20–7.5–1–4]; ... (Emphasis added.)

IC 20–7.5–1–4, –5. Both wages and working conditions are proper subjects of collective bargaining. Bargaining over these two is not a delegation of the school board's authority, since neither has been relegated to the sole province of the school board via § 6(b).

Therefore, the subjects of "wages" and "collective bargaining" were not set aside for the school board's exclusive attention, but they were designated as proper subjects of collective bargaining by the legislature; the trial court improperly found that the application of Article XXIII(G) constituted a delegation of the discretionary authority of the school board. Accordingly, we reverse.

## IX.

### *Delegates to IEERB*

Another claim FWEA makes is that the trial court erred by delegating to the IEERB the power to resolve disputes over the amount of the fee. Although we disagree with FWEA's explanation of the court's analysis, we agree that the trial court erred in this instance. Neither FWEA's explanation of the court's analysis, nor what we perceive to be the court's analysis sustains its finding.

In effect, the question before us is whether the IEERB has statutory authorization to act pursuant to the court's order. In *United Rural Elec. v. Indiana & Michigan Elec.* (1987), Ind.App., 515 N.E.2d 1135, we reiterated the standard for construing statutes.

> When construing any statute, a determination of legislative intent is imperative and that intent should be given deference whenever possible. Intent may be discerned from a consideration of the goals and the policy underlying the statute. [Citation omitted.] ...
>
> Even though a statute on its face is clear, a court must necessarily determine whether a given set of circumstances is encompassed within the bounds of the statute. [Citations omitted.] The court must avoid a strict interpretation which may produce an absurd or mischievous result. [Citation omitted.]

*United Rural, supra,* at 1138. Further, when construing a statute, recognizing what the statute does not say is just as important as recognizing what it does say. *Bonge v. Risinger* (1987), Ind.App., 511 N.E.2d 1082, 1084, *reh. denied, trans. denied.*

While the intent of the legislature is controlling, *United Rural, supra,* at 1138, "[t]he best evidence of legislative intent is the statute itself, 'for that is the expression

of the legislative will.'" *Bailey v. Menzie* (1987), Ind.App., 505 N.E.2d 126, 128, quoting *Bettenbrock v. Miller* (1916), 185 Ind. 600, 606, 112 N.E. 771, 774. We also note that the legislature not only has the power to define terms used, but such definitions are controlling. *Northwest Indiana Educ. Ass'n v. School City of Hobart* (1987), Ind. App., 503 N.E.2d 920, 921.

Finally, an administrative agency has only those powers conferred on it by the General Assembly; powers not in its legislative grant cannot be assumed by the agency nor implied to exist in its powers. *Board of School Trustees v. Indiana Educ. Employment Relations Bd* (1978), 176 Ind.App. 354, 375 N.E.2d 281, 284–85.

According to FWEA, the trial court delegated the resolution of fair share fee disputes to the IEERB based on a finding that the obligation to pay a representation fee amounted to interference, restraint, and coercion of school employees, constituting an "unfair practice" as defined in § 20–7.5–1–7 of CEEBA. According to this section, an "unfair practice" occurs when the school employee organization [10] "[i]nterfere[s] with, restrain[s] or coerce[s] (a) employees *in the exercise of the rights guaranteed by this chapter.*" (Emphasis added.) IC 20–7.5–1–7(b)(1).

Section 20–7.5–1–6 defines those "rights" as follows:

Rights of School Employees and School Employers (a) School employees shall have the right to form, join or *assist employee organizations,* to participate in collective bargaining with school employers through representatives of their own choosing and to engage in other activities, individually or in concert for the purpose of establishing, maintaining, or improving salaries, wages, hours, salary and wage related fringe benefits and other matters as defined in sections 4 and 5 [20–7.5–1–4 and 20–7.5–1–5]. (Emphasis added.)

IC 20–7.5–1–6(a). Obvious by its absence is the "right" not to be compelled to assist employee organizations. Thus, as there is no right not to assist employee organizations, "unfair practice" cannot encompass such a "right."

In fact, courts have expressly decreed that requiring such assistance is constitutional. In *Goetz, supra,* after analyzing this statute in regards to a similar situation, we noted that:

Conspicuously absent is any statutory right to *refrain from* "assisting" or "participating" in a labor organization. (Emphasis added.)

*Goetz, supra,* at 371.

The United States Supreme Court adopted the above conclusion in *Abood, supra,* 431 U.S. at 219–223, 97 S.Ct. at 1791; Indiana Courts have complied. In *Abels, supra,* in ruling on challenges to expenditures made by the employee organization, we explained the rationale for requiring that non-members contribute to the costs of collective bargaining:

It is clear that all employees in a bargaining unit who reap the benefits of an elected exclusive representative's collective bargaining efforts may be required to pay their fair share of the costs of those efforts. [Citation omitted.] *Such a rule prevents "free riders"*—those employees in the bargaining unit who would refuse to join the exclusive representative and yet enjoy the fruits of its collective bargaining activities. [Citation omitted.] (Emphasis added.)

*Abels, supra,* at 538.

Therefore, despite FWEA's arguments, according to Indiana statutory and case law, the obligation to assist employee representatives is not an "unfair practice."

### The Court's Rationale

Pursuant to the terms contained in the court's memorandum of law, it relies on IC 20–7.5–1–7(a)(3) [11] to support its ruling which orders the IEERB to resolve fair

---

**10.** IC 20–7.5–1–2(k) defines "school employee organization."

**11.** In so far as the court meant to refer to § 7(b), for the reasons discussed above, this section also does not sanction the court's ruling.

share fee disputes. Although section 7 discusses a prohibition against conditioning employment on membership in school employee organizations, § 7(a)(3) applies only to *employers.*

(a) It shall be an unfair practice for a *school employer to:*

\* \* \* \* \* \*

(3) Encourage or discourage membership in any *school employee organization* through discrimination in regard to hiring or tenure of employment or any term or condition of employment; (Emphasis added).

IC 20–7.5–1–7(a)(3). The terms "School Employee Organization" and "School Employer" are defined in IC 20–7.5–1–2(k) and (c); the definitions are precise as well as mutually exclusive. Thus, "unfair practice" as defined in § 7(a) can only be committed by the school employer, and not, as the trial court's memorandum infers, by the school employee organization.

▪ Therefore, we find no grant of authority for the IEERB to intervene in disputes between employees and employee organizations. The IEERB cannot be utilized for a purpose other than that for which it was created, and as there is no right *not* to bargain collectively, "unfair practice" cannot include interference with such a "right". Consequently, the court improperly ordered the IEERB to intervene. We reverse.

## X.

### *List of Non–Conforming Chargeable Expenses*

FWEA correctly asserts that the trial court's finding in n. 1 on p. 1005 of the Record, contains a misstatement of the Plaintiff's Brief in Opposition to Defendants' Motion to Amend Counterclaim.

The paragraph in question reads:

D. The law governing proper charges in the representation fee is rapidly developing before the federal Courts of Appeal and the U.S. Supreme Court. *Defend-*

*ants* admit *their* list of chargeable expenses is not in accord with the decisions of the U.S. Supreme Court and U.S. Courts of Appeal regarding chargeable expenses. (Emphasis added.)

"Plaintiff's Brief in Opposition to Defendants' Motion to Amend Counterclaim," Record p. 758. Thus, the Plaintiffs assert that the Defendants made such an admission.

In its findings, the trial court referred to that above paragraph as follows:

1. *Plaintiff's* Brief in Opposition to Defendant's Motion to Amend Counterclaim, filed July 9, 1985, admits in paragraph (D) that *its* "list of chargeable expenses is not in accord" with decisions. (Emphasis added.)

Memorandum Order of Findings, Record p. 1005, n. 1. However, the *Plaintiffs* made no such admission; rather, as shown above, they stated that the *Defendants* did. Thus, contrary to the court's finding, FWEA's paragraph should read: *"Defendants* admit *their."* [12] The Plaintiff FWEA made no such admission.

## XI.

### *Insufficient Evidence Claims*

Although FWEA asserts that there was not sufficient evidence to support certain findings of the Court, we need not address these claims as they are mere "surplusage," having no effect upon the conclusions of the court. Consequently, we do not discuss whether the following findings were supported by sufficient evidence:

Nothing in this record may be said to reasonably advance the declared justification for exclusive bargaining agents; viz: promoting the cause of labor peace in the public sector.

Order of Relief and Injunction, Record p. 1007.

Instead of fairly distributing the costs of exclusive representation, there is a distrust that charges are for self-serving

---

**12.** While we correct the Court's misstatement for future purposes, we note that we found no indication in the Evidentiary Record before us that the defendants actually made the admission which FWEA attributes to them.

and opposing political, ideological, social and other non-germane interests.

*Id.*

The union's procedure has forced a confrontation in a totally adversarial atmosphere of competing, albeit equal and legally cognizable interests at enormous expense of interpersonal tranquility, educative pursuit, time and money which pales the amount of the individual representation fees in controversy, or the amounts which could have been reasonably expected to result from a permissible internal rebate procedure and, which, in fact, did result from the verdicts. (Footnotes omitted.)

*Id.* at 1006.

Opposing camps within the collective bargaining unit within which the costs are to be fairly shared to promote common and desirable public goals of educating the children of this community are instead compelled to expend great resources to vindicate their opposing rights.

*Id.* at 1007.

Thus, while we reverse the court's holdings concerning the "delegation" of school board authority and imposition of power to the IEERB, we affirm the trial court's findings and conclusions regarding the injunction. Given the nature of the rebate procedure, the trial court properly found for the teachers on their counterclaims, holding that the rebate procedure allowed money to be used for political purposes and exacted association. The rebate procedure is contrary not only to *Abood* and Indiana case law, which prohibit the use of nonmembers' funds for political purposes; the rebate procedure also fails to comply with the requirements laid out by the Supreme Court in *Hudson,* to which fair share fee contracts in Indiana must now comply.

Affirmed in part and reversed in part.

SHIELDS, P.J., and HOFFMAN, J., concur.