**Donna SHONDEL and Mark J. McKechnie, Plaintiffs-Appellants,**

v.

**Thomas M. McDERMOTT, individually and as Mayor of the City of Hammond, Indiana, et al., Defendants-Appellees.**

Nos. 84–1982, 84–2862.

United States Court of Appeals,
Seventh Circuit.

Argued April 18, 1985.

Decided Oct. 28, 1985.

As Amended Oct. 31, 1985.

Robert G. Berger, Highland, Ind., for plaintiffs-appellants.

Charles A. Myers, Mchie, Myers & Mchie, Hammond, Ind., for defendants-appellees.

Before CUDAHY and POSNER, Circuit Judges, and PELL, Senior Circuit Judge.

POSNER, Circuit Judge.

Donna Shondel and Mark McKechnie, former employees of Hammond, Indiana, sued the mayor of Hammond (McDermott), other city officials, and city agencies, under section 1 of the Civil Rights Act of 1871 (now 42 U.S.C. § 1983), charging that the defendants had violated the plaintiffs' rights under the First Amendment, as held applicable to state action by virtue of the Fourteenth Amendment. The plaintiffs asked for a preliminary injunction, which was denied. They have appealed from the denial, as they are entitled to do, under 28 U.S.C. § 1292(a)(1).

Mrs. Shondel had been hired as a receptionist in the city's Department of Planning and Development at a time when Mayor McDermott's predecessor, Raskosky (a Democrat—McDermott is a Republican), was in office. She had learned about the opening from her stepfather, Adam Kwolek, the Superintendent of Parks. Her job was a civil-service job, not a patronage job. The district judge found that "she did not obtain her job because of political influence or because of her political activities or beliefs"; she got it by passing a test. Although not a prominent political figure or especially active in the campaign fight between Raskosky and McDermott, Mrs. Shondel attended some of Raskosky's fund-raising affairs and did some minor work at his political headquarters. After McDermott took office he reorganized the city government and as a result of the reorganization a number of employees were fired,

including Mrs. Shondel. Although the ostensible reason for the reorganization was to increase efficiency, an incautious memo from a lawyer who was advising the new administration suggests that the reorganization was a figleaf to conceal political firings. The memo proposes "a massive shake-up of the structure of the City Administration along with an overriding justification of cutting expenses.... [W]hen you shake up the city administration or re-align city administration, reform it, you suddenly eliminate jobs of people that you really want to get rid of.... [M]ake sure that when you eliminate the jobs of people you want to get rid of, you also eliminate the jobs of a few of the people that supported McDermott so that you can later point to that as evidence that the over-riding or motivating factor in eliminating those jobs was not political affiliation but rather was the reason which McDermott would be giving to the public."

The district judge rejected any suggestion that Mrs. Shondel had been (in his words) "terminated for any political activity on her part." The "only apparent basis for her claim of wrongful termination is that she is a stepdaughter of Adam Kwolek." McDermott had said during the campaign that he would fire Kwolek because Kwolek was one of the two or three "lousiest" of Raskosky's department heads; and he did fire him. The judge thought it unnecessary to decide whether Mrs. Shondel had been fired to further punish Kwolek; it was enough that she had not been fired because of her own activities on Raskosky's behalf during the campaign, activities too insignificant to have brought such retribution upon her head—as she herself had testified. Although there is considerable doubt whether Mayor McDermott even knew that Mrs. Shondel is Kwolek's stepdaughter, other defendants may have known, but again this is not a matter on which the district judge made any findings.

Mark McKechnie, the other plaintiff, was the city's Transportation Coordinator under Raskosky. He supervised the city's bus system, which is supported in part by federal grants, and he was an active supporter of Raskosky during the mayoral campaign. In addition to attending fund-raising affairs, working one night a week at Raskosky headquarters, wearing an "Eddie" (Raskosky) button, and displaying a Raskosky bumper sticker on his car, McKechnie displayed Raskosky's name prominently on city buses (without charge to Raskosky's campaign) and also joined with Mayor Raskosky in a "walking campaign" between 10:00 a.m. and 2 p.m. on many weekdays.

After the election the new mayor fired McKechnie, ostensibly to save money. The district judge made no finding on the real motive for the firing. His ground for refusing to grant a preliminary injunction reinstating McKechnie was that McKechnie had "unclean hands." Although none of the defendants had argued "unclean hands" or put in evidence directed to the question, the judge on his own initiative found that "it appears likely" that McKechnie had violated the Hatch Act, 5 U.S.C. §§ 1501–1508. Well known as a limitation on the political activities of federal employees, the Hatch Act also contains a little-known provision forbidding "an individual employed by a state or local agency whose principal employment is in connection with an activity which is financed in whole or in part by loans or grants made by the United States or a Federal agency" to "use his official authority or influence for the purpose of ... affecting the result of an election or a nomination for office." 5 U.S.C. §§ 1501(4), 1502(a)(1). (The Act places tighter restrictions on the political activities of federal employees.) There seems to be no question that McKechnie's job brought him within the scope of the provision, but it is less clear whether he actually violated it. Apparently the district judge's concern was with the painting of Mayor Raskosky's name on the bus, an arguable use of McKechnie's official authority to influence the campaign; but the judge did not address McKechnie's argument that the painting was normal publicity for the mayor, unrelated to the campaign. The judge seems not to have been concerned with the walking campaign, and this is understanda-

ble. It is unclear whether McKechnie identified himself as a city official on these walks. And even if he was campaigning when he should have been working—which is also unclear, because he contends that the time he spent in the walking campaign was compensatory time off for earlier overtime work, and the judge made no finding on this issue—it is a little hard to see how that by itself would be the use of official authority or influence. But we shall not have to get deeper into this thicket, except to note that no proceedings have been brought against McKechnie for violation of the Hatch Act.

The firings of the two plaintiffs raise distinct issues. We begin with Mrs. Shondel. We accept as not clearly erroneous the judge's finding that she was not fired because of her political activities or, it appears, beliefs. But we must also accept for purposes of this appeal, since there is some support for the contention and the judge made no finding on it, that she was fired because her stepfather was a political opponent of the new mayor.

We do not know why Kwolek was fired—whether for incompetence, or because of his association with the old mayor—but shall assume for argument's sake that his firing was based entirely on political grounds. If we further assume, again for the sake of argument, that he was neither a policy-making nor a confidential employee and therefore could not, consistently with the First Amendment, be fired on political grounds, it could be argued—we shall not have to decide how strongly—that Mrs. Shondel made out a violation of the First Amendment even though she was not fired because of her own political activities or beliefs.

■ The purpose of making the firing of a public employee because of his political beliefs a violation of the First Amendment, see *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), is to ensure that such employees are not deterred from exercising their rights under the First Amendment;

and a Kwolek might be deterred if he knew that his stepdaughter would lose her job as a result. One way to prevent this would be to allow him to claim, as part of his damages for being fired, the cost to him of his stepdaughter's losing her job. The analogy would be to the tort claim of a parent whose child is killed in an accident as a result of someone's negligence. But the analogy would be imprecise. If a child is killed, a minimum estimate of the loss to the parents can be based on the time and money that the parents expended on raising the child; they would not have incurred these costs had they not anticipated offsetting benefits. See, e.g., *Wycko v. Gnodtke,* 361 Mich. 331, 339, 105 N.W.2d 118, 122 (1960); *Breckon v. Franklin Fuel Co.,* 383 Mich. 251, 268, 174 N.W.2d 836, 842 (1970); cf. Pottick, *Tort Damages for the Injured Homemaker: Opportunity Cost or Replacement Cost?,* 50 U.Colo.L. Rev. 59 (1978). But if a child, particularly a grown child, whose earnings are his own, merely loses a job, the loss to the parents is very hard to determine unless the child becomes financially dependent on them, and there is no suggestion of anything of that sort here. There is a loss, because the child's welfare is part of the parents' welfare, see, e.g., *CBI Industries, Inc. v. Horton,* 682 F.2d 643, 645–46, 647 (7th Cir. 1982); Becker, A Treatise on the Family (1981), but not a loss that can be given a money value by any methods known to the law. In these circumstances there is an argument for allowing the child, or, here, the stepchild to sue, in order to discourage the subtle type of retaliation for exercising First Amendment rights that consists of firing a politically inactive relative of the person whom you want to punish. A somewhat similar argument was made in *Molerio v. FBI,* 749 F.2d 815, 824–25 (D.C.Cir. 1984), though the court was able to decide the case without resolving it—as shall we.

■ For if, contrary to the assumption on which our analysis up to this point has been based, Kwolek was a policymaking officer, he could be fired for any reason without violation of the First Amend-

ment—could even be fired simply because he supported a defeated candidate, see, e.g., *Elrod v. Burns, supra,* 427 U.S. at 367–68, 96 S.Ct. 2686–87 (plurality opinion); *Shakman v. Democratic Organization of Cook County,* 722 F.2d 1307, 1309–10 (7th Cir.1983) (per curiam), and therefore Mrs. Shondel could not, not easily anyway, sue on a theory of derivative standing to assert her stepfather's First Amendment rights. So it could be quite important whether Kwolek was or was not a policy-making officer. On this question the briefs are silent and the district judge made no findings. Everyone seems to have assumed that as the head of a major city department Kwolek must have been a policy-making officer, but we hesitate to so hold as a matter of law without any evidence about the structure of Hammond city government. Bear in mind that the expression "policy-making officer" as it is used in public-employee freedom of speech cases is just a shorthand expression for an employee whose political loyalty is important to the effective operations of government. See, e.g., *Branti v. Finkel, supra,* 445 U.S. at 518, 100 S.Ct. at 1294–95; *Tomczak v. City of Chicago,* 765 F.2d 633, 641 (7th Cir.1985). That is why in *Soderbeck v. Burnett County,* 752 F.2d 285, 288 (7th Cir.1985), we said that a policy-maker's confidential secretary, who herself had no policy-making powers, could be fired for lacking political loyalty; it is the kind of job in which such loyalty is important. A city's chief medical examiner formulates medical policy but political loyalty is unlikely to be important to the effectiveness of the city's government; indeed, it could be quite detrimental. If we have to guess we guess that the Superintendent of Parks for the City of Hammond is not just a technician, that his performance has a political dimension in the sense that it cannot be evaluated on the basis solely of neutral, apolitical criteria of professional competence. And guess we must. The issue before us is the likelihood of Mrs. Shondel's prevailing on the merits when and if the case is tried, and as the record now stands our best prediction is that Kwolek is a policy-making officer for

purposes of applying the First Amendment and that if Mrs. Shondel tries to prove the contrary she will fail. So for purposes of our decision today, without meaning to foreclose the issue at trial, we shall assume that Kwolek indeed could be fired with impunity without violation of the First Amendment.

If Kwolek thus was fair game for Mayor McDermott, it is unlikely that the First Amendment was violated even if (as alleged, though of course not yet proved) Mayor McDermott fired Mrs. Shondel merely because she was Kwolek's stepdaughter. The purpose of allowing her to sue would be, as we said earlier, to discourage the subtle form of retaliation that consists of firing the relatives of your political opponents in order to hurt the opponents themselves; and if you are allowed to fire the opponents and thus retaliate against them as forthrightly as is possible without committing a breach of the peace, it is a little hard to see why you should not be allowed to retaliate against them indirectly by firing their relatives.

■ Of course we do not condone what, if proved, would be a petty and despicable act of revenge. But not every wrong done by local government is remediable in a federal court. The First Amendment does not ordain a meritocratic civil service, or even basic decency in government. A public employee fired for reasons unrelated to the efficient operation of government still has no remedy under the First Amendment unless the firing impairs freedom of speech. Firing Mrs. Shondel could not discourage her, or one like her, from expressing her political views freely, for it was not those views, or her unimportant activities in Raskosky's campaign, that got her fired. And although a threat to fire her, however politically inert she was, might conceivably have discouraged Adam Kwolek from expressing his own political views freely, he had no constitutionally protected right to express those views and retain his job—and if fear of losing his job did not inhibit him, how likely is it that he would have been

inhibited by fear that his stepdaughter might lose her job?

There may be, it is true, more justification for firing a political enemy than for retaliating against his family. In the former case the firing serves the legitimate purpose of enabling harmony to be achieved at the policy-making level of government; in the latter case it is merely vindictive. But at least in the absence of any evidence on the point (and we can find none in the record), the deterrent effect of such retaliation must be judged too slight to warrant giving the family member a right to sue, in effect to enforce someone else's First Amendment rights—at least when the someone else (we are assuming, for reasons discussed earlier) is a policy-making official whose right of free speech is severely circumscribed anyway. And it is not as if the defendants had said to Kwolek, quit the Democratic party or we'll kill Donna. Even then her right to bring suit under the First Amendment would be somewhat questionable since her own freedom of speech would not be in jeopardy and since she would have abundant remedies under state law; but of course it would be a far harder case than this.

Many public employees have relatives in policy-making positions and like Mrs. Shondel learn about job openings from those relatives. To allow every discharged public employee to bring a First Amendment suit based on an allegation of hostility to a policy-making relative would trivialize the great objects of the First Amendment. And if such an expansion in the scope of the First Amendment is to be brought about anyway, at least let it be done in a case where there is evidence that the firing of the relative is likely to deter expressive activity, and no such evidence was presented here; again however we emphasize the summary nature of a proceeding on motion for preliminary injunction. Nor was there evidence that if Mrs. Shondel had known that she might be fired because of her relationship to Adam Kwolek she might have tried to head off that catastrophe by throwing her support to McDermott in the election; this would be another way in which a threat of retaliation against a relative might affect expressive activity, and conceivably be actionable.

There also is no evidence that retaliation against relatives of political opponents is sufficiently widespread to warrant the forging of new doctrine, and some evidence that it is not is that we have found no reported case like this one, unless it is the *Soderbeck* case, discussed below. Should the problem ever become a serious one, we would be more than willing to reconsider the conclusions reached in this opinion. And of course Mrs. Shondel may be able to build a more convincing record when the case comes to trial; we have only the record compiled in the preliminary injunction proceeding.

*Soderbeck v. Burnett County, supra,* is the closest case to this case that we have found. Mrs. Soderbeck was the wife of the incumbent sheriff and also worked in the sheriff's office. Kellberg beat Soderbeck in the next election and the first thing he did on taking office was to fire Mrs. Soderbeck. We upheld a finding that she had been fired in violation of the First Amendment. If the only reason for firing her had been to retaliate against her husband we would have had a case very like this one; but we described her as a "presumed ally" of her husband, 752 F.2d at 287, a choice of words which reflected the fact that Kellberg had not denied that he fired her because of her political beliefs as well as because of who her husband was.

■ We also reject the argument that by penalizing Mrs. Shondel for being Adam Kwolek's stepdaughter the defendants infringed her right of family association. A state or local government that forces a person to live apart from his family deprives him of a form of liberty that is protected by the due process clause of the Fourteenth Amendment. See, e.g., *Santosky v. Kramer,* 455 U.S. 745, 753–54, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982); *Hameetman v. City of Chicago,* 776 F.2d 636, 642 (7th Cir.1985); *Ellis v. Ham-*

*ilton,* 669 F.2d 510, 512 (7th Cir.1982); *Franz v. United States,* 707 F.2d 582, 595–602 (D.C.Cir.1983). And despite the procedural connotations of "due process," the current view is that the family rights which the due process clause protects have a substantive dimension, so that an unreasonable deprivation may be unconstitutional even if it involves no procedural irregularity. See, e.g., *Zablocki v. Redhail,* 434 U.S. 374, 383–87, 98 S.Ct. 673, 679–81, 54 L.Ed.2d 618 (1978); *Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977); *Hameetman v. City of Chicago, supra,* at 642; *Laurenzo v. Mississippi High School Activities Ass'n, Inc.,* 662 F.2d 1117, 1119–20 (5th Cir.1981). There is even authority—we do not need to decide how persuasive—that the First Amendment confers a right of association unrelated to freedom of expression, and that it is therefore a deprivation of liberty within the meaning of the due process clause of the Fourteenth Amendment to fire a policeman for dating the daughter of a convicted felon and organized-crime figure. *Wilson v. Taylor,* 733 F.2d 1539, 1542–44 (11th Cir.1984). Even *Wilson* would not help the plaintiff in this case, as there is no suggestion that Mrs. Shondel lives with Adam Kwolek or that her specific associations with him were responsible for her being fired. If the threat of being fired could not deter her from associating with her stepfather because she would have been fired even if she had had no contacts with him, then her right to associate with members of her family could not be infringed by the defendants' conduct.

There is an alternative argument, that knowledge that she might be fired if she were Kwolek's stepdaughter might have dissuaded her mother from marrying him. But this is much too conjectural, remote, and improbable a connection between the defendants' conduct and the plaintiff's family to bring the family-rights cases into play and allow Mrs. Shondel to sue—again in a representative capacity, only this time on behalf of her mother. Cf. *Califano v. Jobst,* 434 U.S. 47, 53–55, 98 S.Ct. 95, 99–100, 54 L.Ed.2d 228 (1977); *Molerio v. FBI, supra,* 749 F.2d at 824 n. 4.

If Mrs. Shondel had been fired because she had associated with Kwolek in some particular way we might have a different case; but if as appears she was fired simply because she was known to be his stepdaughter, her right to associate with the members of her family could not have been infringed.

■ These conclusions require us to affirm the district judge's denial of Mrs. Shondel's motion for preliminary injunction, for the movant must show "some likelihood of succeeding on the merits," *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 387 (7th Cir.1984), and, on the record compiled in the district court hearing, she has not shown this. So we come to McKechnie's case.

Although one might have thought him high enough in Hammond's government hierarchy to be a policy-making official, the defendants make no argument that he was and the district judge made no finding on the point. (If McKechnie was not a policy-making officer, as the defendants, who know more about Hammond's government than we do, may have conceded, then maybe neither was Kwolek.) And although the defendants dispute most vigorously that McKechnie was fired because of his support for Mayor Raskosky, the evidence is far too mixed for us to make a finding on the question, and once again the district judge made none. For purposes of this appeal we must assume that McKechnie was fired because of his political views in violation of the First Amendment.

There is a nice question, one which fortunately we need not try to answer in this case, whether such an employee can obtain a preliminary injunction ordering his reinstatement without showing irreparable harm, another conventional prerequisite to preliminary relief. See, e.g., *id.* at 387. *Elrod v. Burns* holds that a litigant who asks for a preliminary injunction to prevent a deprivation of free speech need not show that he will be irreparably harmed if the injunction is denied, because "the loss of

First Amendment freedoms, even for minimal amounts of time, unquestionably constitutes irreparable injury." 427 U.S. at 373, 96 S.Ct. at 2689 (plurality opinion). See also, e.g., *Libertarian Party v. Packard*, 741 F.2d 981, 985 (7th Cir.1984). But this was said about a preliminary injunction to prevent a threatened discharge of government workers. The opinions in *Elrod* do not discuss reinstatement. In a case decided two years earlier the Supreme Court had indicated that a very strong showing of irreparable harm is required for a preliminary injunction that orders a government worker reinstated. *Sampson v. Murray*, 415 U.S. 61, 83–84, 92 n. 68, 94 S.Ct. 937, 949–50, 954 n. 68, 39 L.Ed.2d 166 n. 68 (1974). Although *Sampson* differs from *Elrod* in a number of respects, among them that the plaintiff in *Sampson* was a probationary employee with very limited job rights and was not claiming a violation of the First Amendment, the opinion in *Sampson* contains various observations— for example about the reluctance of common law courts to order specific performance of personal service contracts, see 415 U.S. at 83, 94 S.Ct. at 949—that apply to reinstatement generally.

And while *Sampson* did not involve the First Amendment, *Elrod* does not mention reinstatement, though some of the plaintiffs were seeking reinstatement, see *Burns v. Elrod*, 509 F.2d 1133, 1135 (7th Cir.1975), aff'd, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and presumably got it on the basis of the Supreme Court's ruling that they were entitled to preliminary relief. *Elrod* does not cite *Sampson*. So maybe it can be argued that a plaintiff who wants a preliminary injunction that will restore him to government employment must show more than a bare First Amendment violation, must show irreparable harm as well. In rebuttal it can be urged that since *Sampson* was heavily cited to the Justices in the briefs in *Elrod*, the fact that none of the Justices cited *Sampson* suggests not that they thought *Elrod* a case not involving reinstatement but that they did not consider *Sampson* applicable to First Amendment cases. The Justices

may have agreed with the plaintiffs in *Elrod* that *Sampson* "did not involve actual or threatened discharge for the exercise of constitutional rights, thus rendering the case wholly irrelevant." Resp.Br. 17. True, our decision in *Lasco v. Northern*, 733 F.2d 477, 481 (7th Cir.1984), applied *Sampson* to a political-firing case, but without discussion of the bearing of the discussion of irreparable harm in the plurality opinion in *Elrod*, and without discussion of *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir.1978), which followed *Elrod* rather than *Sampson*, or of the other cases, discussed in Judge Sprecher's dissenting opinion in *Ciechon v. City of Chicago*, 634 F.2d 1055, 1064 (7th Cir.1980), that interpret *Sampson* narrowly. See also *Perry v. City of Fort Wayne*, 542 F.Supp. 268, 274 (N.D.Ind.1982), and on the general issue *American Postal Workers Union v. United States Postal Service*, 766 F.2d 715, 721–22 (2d Cir.1985).

We need not try to unravel the skein here, however. The parties have made no issue of irreparable harm; the only issue before us on McKechnie's appeal is whether the district court was right to deny him a preliminary injunction because of his "unclean hands."

The maxim that "he who comes into equity must come with clean hands," although comparatively recent as equity maxims go, see Chafee, *Coming Into Equity With Clean Hands [I]*, 47 Mich.L.Rev. 877, 880 (1949), captures very nicely the moralistic, rule-less, natural-law character of the equity jurisprudence created by the Lord Chancellors of England when the office was filled by clerics. The moralistic language in which the principles of equity continue to be couched is a legacy of the time when a common lawyer could, without sounding too silly, denounce equity as "a Roguish thing" because "Equity is according to the Conscience of him that is Chancellor, and as that is larger or narrower, so is equity." The Table-Talk of John Selden 64 (Singer ed. 1847 [1689] ). But the time itself is long past, and the proposition that equitable relief is "discretionary" cannot be

maintained today without careful qualification. See, e.g., *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 939 (7th Cir. 1984) (concurring opinion). A modern judge, English or American, state or federal, bears very little resemblance to a Becket or a Wolsey or a More, but instead administers a system of rules which bind him whether they have their origin in law or in equity and whether they are enforced by damages or by injunctions. To tell a plaintiff that although his legally protected rights have been invaded and he has no adequate remedy at law (i.e., damages) the judge has decided to withhold equitable relief as a matter of discretion just would not wash today. Even when the plaintiff is asking for the extraordinary remedy of a preliminary injunction—extraordinary because it is often a very costly remedy to the defendant, yet is ordered on the basis of only a summary inquiry into the merits of the plaintiff's suit—the request is evaluated according to definite standards, rather than committed to a free-wheeling ethical discretion. See *Roland Machinery Co. v. Dresser Industries, Inc., supra,* 749 F.2d at 382–88.

█ Today, "unclean hands" really just means that in equity as in law the plaintiff's fault, like the defendant's, may be relevant to the question of what if any remedy the plaintiff is entitled to. See Chafee, *Coming Into Equity With Unclean Hands [II],* 47 Mich.L.Rev. 1065, 1092 (1949). An obviously sensible application of this principle is to withhold an equitable remedy that would encourage, or reward (and thereby encourage), illegal activity, as where the injunction would aid in consummating a crime, the issue in *Johnson v. Yellow Cab Transit Co.,* 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814 (1944). In what may have been the earliest application of the principle of unclean hands, a highwayman was refused an accounting against his partner in crime (and later hanged, to boot, along with the partner). See *Everet v. Williams* (Ex. 1725), belatedly reported in Note, *The Highwayman's Case,* 35 L.Q.Rev. 197 (1893), and briefly discussed in Prosser and Keeton on the

Law of Torts, § 50, at p. 336 n. 4 (5th ed. 1984). See also Bispham, The Principles of Equity 64 (7th ed. 1905). A common modern application of "unclean hands" is to intellectual-property cases in which an injunction is sought in aid of unlawful activity. If for example a plaintiff who had acquired a patent in violation of antitrust limitations on patent pooling brought a suit to enjoin another from using the patent, the injunction would be refused on the ground that awarding it would assist in a violation of the antitrust laws. *Frank Adam Elec. Co. v. Westinghouse Elec. & Mfg. Co.,* 146 F.2d 165 (8th Cir.1945). Similarly, the owner of a trademark that was itself misleading, such as the trademark "Syrup of Figs" for a laxative that was not in fact a syrup of figs, could not get an injunction against the infringement of his mark. *Worden & Co. v. California Fig Syrup Co.,* 187 U.S. 516, 528, 539–40, 23 S.Ct. 161, 188, 47 L.Ed. 282 (1903). An injunction would protect his misrepresentation.

█ If the facts of this case brought it within the scope of the "unclean hands" doctrine, it would not matter that the plaintiff was seeking a preliminary rather than a permanent injunction, cf. *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.,* 697 F.2d 1352, 1354–55 (11th Cir.1983), or that the defendant had not asked the judge to deny the preliminary injunction on the basis of unclean hands, see *Gaudiosi v. Mellon,* 269 F.2d 873, 881–82 (3d Cir.1959). Because an injunction so often affects the interests of third parties and commits the judge to active supervision, he has a duty not to issue the injunction unless satisfied that it is lawful and proper, whatever the parties may have agreed to or decided not to contest. See *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 815, 65 S.Ct. 993, 997–98, 89 L.Ed. 1581 (1945); cf. *Duran v. Elrod,* 760 F.2d 756, 759 (7th Cir.1985); *Donovan v. Robbins,* 752 F.2d 1170, 1176 (7th Cir. 1985).

■ Nor do we think the doctrine without possible application to First Amendment cases, though precedents are few. It is true that *Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), and cases following it such as *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), which allow a person whose own conduct could be punished without violating the First Amendment to challenge the statute under which he was punished on the ground that it might in another case be interpreted to reach privileged conduct, suggest a definite hostility to inquiring into a plaintiff's misconduct when he is seeking to vindicate freedom of speech. But these are not equity cases, and we may assume that, as held in *Sullivan v. Houston Independent School District*, 475 F.2d 1071, 1077 (5th Cir.1973), the doctrine of unclean hands could be used in a First Amendment case that resembled our patent example. If McKechnie had threatened to fire workers under him who supported the challenger, McDermott, unclean hands might bar McKechnie from getting an injunction against being fired for his political activities on Raskosky's behalf. He would be asking for protection against the very wrong he had inflicted on his subordinates, and to give him that protection would encourage the kind of wrongdoing that he was seeking to enjoin, and would therefore be a perverse use of judicial resources.

■ No one suggests, however, that McKechnie was trying to interfere with anybody's First Amendment rights. If he ran afoul of the Hatch Act, itself a limitation on free speech by public employees (though at some deep level both the Hatch Act and the doctrine of interpretation of the First Amendment that protects the political freedom of government employees could be said to be unified in a concern with abuses of power by incumbent office holders), it was out of an excess of zeal to campaign for Raskosky—but without intimidating the supporters of McDermott. To apply unclean hands here thus would violate the principle that "ordinarily, the clean hands doctrine only applies when

there is a direct nexus between the bad conduct and the activities sought to be enjoined." *International Union, Allied Industrial Workers v. Local Union No. 589*, 693 F.2d 666, 672 (7th Cir.1982). The linguistically fastidious may shudder at "nexus," that hideously overworked legal cliché, but there can be no quarrel with the principle. Unless courts insist on a tight connection between the object of the injunction and the misconduct of the plaintiff, suits for injunction will bog down in all sorts of collateral inquiries. In this age of legalism, when relatively few plaintiffs are wholly free from any trace of arguable misconduct at least tangentially related to the objective of their suit, the right to injunctive relief, especially to preliminary injunctive relief, would have little value if the defendant could divert the proceeding into the byways of collateral misconduct. The issues under the Hatch Act have to do with such things as how much money the Hammond bus system gets from the federal government and whether McKechnie identified himself as a city official on his "walking campaigns." They have nothing to do with the First Amendment.

■ The waiver by the Supreme Court in *Elrod* of proof of irreparable harm in preliminary-injunction cases under the First Amendment rests on the view that the balancing of equities that is undertaken in a conventional equity case is out of place in dealing with rights so important as the modern Supreme Court considers the rights of expression to be. Equitable defenses such as unclean hands may also have more limited play in free-speech cases than elsewhere. There is an analogy to antitrust law, where the Supreme Court has forbidden the recognition of a similar equitable defense—*in pari delicto* (equally at fault) —in order to encourage antitrust enforcement. *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). Last year this court refused to apply the doctrine of unclean hands in an antitrust case where the application of the doctrine would have defeated the objectives of antitrust

law, *General Leaseways, Inc. v. National Truck Leasing Ass'n,* 744 F.2d 588, 597 (7th Cir.1984)—though earlier in this opinion we gave an example where the doctrine would be applied in an antitrust case in order to achieve those objectives. Occasional application of the doctrine in First Amendment cases may be proper and even necessary but too free-wheeling a use of the doctrine could invade the First Amendment rights of public employees, and to apply the doctrine with such an effect merely to enforce a statute that limits freedom of expression—the Hatch Act—is surely wrong.

█ To summarize, the denial of Mrs. Shondel's request for a preliminary injunction is affirmed, but the denial of Mr. McKechnie's request is reversed and his case remanded to the district court for further proceedings consistent with this opinion. There shall be no award of costs in this court, and Circuit Rule 18 shall not apply on remand.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

CUDAHY, Circuit Judge, concurring:

As to Shondel, I would reach the same result as the majority but by a somewhat different route. The "policymaker" exception to the ban on political firings was created because of the overriding governmental "need for political loyalty of employees ... to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Elrod v. Burns,* 427 U.S. 347, 367, 96 S.Ct. 2673, 2686–87, 49 L.Ed.2d 547 (1975). If Kwolek was a policymaker, the Mayor was entitled to fire *him* because the Mayor had an overriding interest in having loyal employees heading his city departments. On the other hand, if Kwolek was a policy-maker and the Mayor fired his apolitical stepdaughter—a receptionist—it is difficult to argue that this termination in *any* way advanced the asserted governmental interest in loyal policymaking employees. And if the firing did not advance that interest,

then we have to readdress the question of Kwolek's rights: he had no right to speak out and retain a job, but did he have a right to speak out and have an employed stepdaughter?

On this question *Elrod* would seem to require a new balancing. We would balance the individual First Amendment right against the governmental interest in merely permitting the Mayor to be vindictive, which on its face seems less than compelling. *See Bart v. Telford,* 677 F.2d 622 (7th Cir.1982). Hence, I am not at all sure that Shondel's firing can be justified merely because Kwolek is a policymaker. If Kwolek were bringing this suit himself, asserting that his speech is chilled by a knife hanging over the heads of his family, *Elrod* might well compel the result that there was at least a question of fact whether the Mayor's actions rose to the level of an actionable constitutional tort.

I think we need not reach this question here, however. Particularly since I believe it is undesirable to extend *Elrod* on the present facts, I would hold that Shondel has no standing to maintain this suit based on the violation of her stepfather's constitutional rights.