Rudy BYRON, Plaintiff–Appellant,
Cross–Appellee,

v.

Rudolph CLAY, et al.,
Defendants–Appellees,
Cross–Appellants.

Nos. 88–1791, 88–1898.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 10, 1989.

Decided Feb. 14, 1989.

Hamilton L. Carmouche, Merrillville, Ind., for plaintiff-appellant, cross-appellee.

James B. Meyer, King & Meyer, Gary, Ind., for defendants-appellees, cross-appellants.

Before BAUER, Chief Judge, and POSNER and COFFEY, Circuit Judges.

POSNER, Circuit Judge.

The question presented is whether the First Amendment entitles the plaintiff, Rudy Byron, who describes himself as "a political hack employed in a make-work position doing virtually nothing in an unnecessary job," to be reinstated to that position, with back pay "to date of reinstatement [and] with all applicable benefits and pay increase to which plaintiff would be entitled had he not been dismissed," be-

cause he was fired for political reasons. These quotations from the plaintiff's brief accurately describe the job Byron lost and the relief he requested of the district court, which after a four-day bench trial gave judgment for the defendants and dismissed the suit.

Byron was a friend, political supporter, and protegé of Atterson Spann. Spann (successor to Rudy Bartolomei, the star of *Lindahl v. Bartolomei,* 618 F.Supp. 981 (N.D.Ind.1985), another political-firing case) was one of three members of the Board of Commissioners of Lake County, Indiana. The others were an ally of Spann's, Steve Corey, and an enemy, Ernest Niemeyer; so Spann and Corey controlled the Board. In 1983 Spann hired Byron to work for the Board at an annual salary of $18,700. His job was to inspect three county courthouses and report any maintenance problems that he discovered. Since each courthouse had a building manager able to do any inspecting that needed doing, Byron's job was not taxing (except on the citizens of Lake County). It is uncertain whether he ever visited any courthouse or made any reports; but probably not. He never filled out a time sheet and did not even know who his immediate supervisor was.

In the Lake County Democratic primary held in May 1986, Spann—whose campaign Byron had managed—was defeated for renomination by Rudolph Clay. Clay went on to win the general election in the fall, and having won he formed a coalition with Niemeyer to run the Board of Commissioners. Before the new Board took office, Byron received another job assignment, but he refused to sign in for the new job or to undertake its duties, the nature of which is not specified in the record.

Counseled by attorney Dull, the new Board of Commissioners spent its first day in power, January 2, 1987, firing Byron and other employees. But rather than abolish Byron's make-work job the new Board gave it to Rudolph Clay's son. Clay père had been heard to make comments about finding jobs for his political supporters, and Byron was not the only person fired who had supported Spann. Byron now makes

his home in prison, having received a nine-year term for tax evasion. Spann is there too, for the same offense.

Byron brought this suit against Clay and Niemeyer under section 1 of the Civil Rights Act of 1871, now 42 U.S.C. § 1983, and he presses on us the following syllogism: The First Amendment has been interpreted to forbid a public employer to fire an employee on political grounds unless the employee is either a policy-making employee or a confidential one. See *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Kurowski v. Krajewski,* 848 F.2d 767 (7th Cir.1988); *Shondel v. McDermott,* 775 F.2d 859 (7th Cir.1985). Byron was neither, and was fired by his public employer on political grounds. Therefore his rights under the First Amendment were violated.

The magistrate who tried this case with the consent of the parties under 28 U.S.C. § 636(c) did not question the validity of Byron's syllogism but was unwilling to "permit the plaintiff to recover what simply was political payola.... Evidence has demonstrated that Byron already has conducted a raid on the public treasury. He will not be permitted to use the federal courts to pilfer additional county funds." Byron appeals. The defendants cross-appeal, arguing first that even if we find that they violated Byron's constitutional rights we should not order him reinstated, since he is in prison, and second that they fired him not to make way for another political hack (Rudolph Clay, Jr.) but because he didn't do any work.

██ The cross-appeal is improper. The district court's judgment is entirely in the defendants' favor, and you can't appeal from a judgment entirely in your favor. *LaBuhn v. Bulkmatic Transport Co.,* 865 F.2d 119, 121–22 (7th Cir.1988). The defendants are simply advancing additional arguments in support of the judgment, and this they can do perfectly well in their answering brief. *United States v. American Railway Express Co.,* 265 U.S. 425, 435–36, 44 S.Ct. 560, 564, 68 L.Ed. 1087

(1924); *Huebschen v. Department of Health & Social Services,* 716 F.2d 1167, 1171 (7th Cir.1983). A cross-appeal is an *appeal,* and is therefore in order only when a party wants to change (even if only conditionally) the trial court's judgment. We repeat our admonition against the filing of unnecessary cross-appeals. See *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 439 (7th Cir.1987).

■ Byron characterizes the district court's reasoning as an application of the equitable defense of "unclean hands" (on which see 2 Pomeroy's Equity Jurisprudence §§ 397 *et seq.* (5th ed. 1941)), and he points out that in *Shondel v. McDermott, supra,* we cautioned against the expansive use of the defense in political-firing cases. See 775 F.2d at 867–70. He urges that such cases not be turned into postmortems on the plaintiff's competence—that the question is not whether Byron was a good worker but whether he would have been fired if he hadn't opposed his employer's election. The magistrate found that the firing of Rudy Byron was indeed "a political firing," and although the defendants question this finding it is adequately supported by the record and therefore binds us. We note that Clay *may* have fired Byron less to get rid of him than to make room for Clay's son. If Byron would have lost his job anyway, for a nonpolitical (however disreputable) reason, there would be no actionable violation of the First Amendment. Cf. *Lindahl v. Bartolomei, supra,* 618 F.Supp. at 990–91. The First Amendment does not forbid nepotism. But as we said we accept that this was a political firing.

· [3, 4] The doctrine of unclean hands, functionally rather than moralistically conceived, gives recognition to the fact that equitable decrees may have effects on third parties—persons who are not parties to a lawsuit, including taxpayers and members of the law-abiding public—and so should not be entered without consideration of those effects. Cf. *Shondel v. McDermott, supra,* 775 F.2d at 868. It thus is an aspect of the broader principle that adjures a court to consider the third-party effects of equitable relief and to shape that relief accordingly, see, e.g., *Derrickson v. City of Danville,* 845 F.2d 715, 717–19 (7th Cir. 1988); *Duran v. Elrod,* 760 F.2d 756, 759 (7th Cir.1985)—if need be, to deny such relief. Broad or narrow, the principle of these cases is applicable to Byron's request for reinstatement. For us to order him reinstated even though he is in prison, and (more important—since he'll be out eventually) even though he does no work and, judging from his reaction to his last job assignment, refuses to do any work, would harm both the criminal justice system and the people of Lake County, whose tax dollars would pay this parasite's salary. Although a modest salary in absolute terms, it is bountiful in relation to the amount of work Byron is prepared to do for it (zero). True, his successor as supernumerary courthouse inspector may be no improvement. But to give ghost employees a form of job tenure by ordering them reinstated if they are fired on political grounds will encourage them in their efforts to exploit public employment for private enrichment, cf. *International Union, Allied Industrial Workers of America v. Local Union No. 589,* 693 F.2d 666, 673 (7th Cir.1982) (per curiam), thereby vindicating Ambrose Bierce's definition of politics: "A strife of interests masquerading as a contest of principles. The conduct of public affairs for private advantage."

The difference between a bad worker and a no-worker may seem too fine to make a legal difference to a court as concerned as this court is with making the law as clear as possible. But while a bad worker is not a criminal, Indiana has a statute making "ghost employment" a crime. See Ind.Code § 35–44–2–4(c); *Fadell v. State,* 450 N.E.2d 109, 118 (Ind.App.1983). The supremacy clause notwithstanding, a federal court should hesitate to order the commission of a state crime. In arguing that he, not Clay fils, should have the opportunity to defraud the people of Indiana, Byron is like the highwayman who sued his partner in crime for an accounting of the profits—and was hanged for his efforts. See Note, *The Highwayman's Case,* 35 L.Q.

Rev. 197 (1893) (*Everet v. Williams*, Ex. 1725).

Yet unclean hands is an equitable defense, and Byron seeks not only reinstatement, an equitable remedy, but also damages. We could construe Byron's request for relief, quoted at the outset of this opinion, as seeking back pay merely as an incident to reinstatement. This would be an equitable request under the "clean up" doctrine, on which see *Medtronic, Inc. v. Intermedics, Inc.*, 725 F.2d 440, 442–43 (7th Cir.1984), and would therefore be subject to the defense of unclean hands. But to read the request for relief so narrowly would be hypertechnical. We shall assume that Byron is seeking not only equitable relief but also common law damages.

But with the merger of law and equity, it is difficult to see why equitable defenses should be limited to equitable suits any more; and of course many are not so limited, see, e.g., *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 938–39 (7th Cir. 1984) (concurring opinion), and perhaps unclean hands should be one of these. Even before the merger there was a counterpart legal doctrine to unclean hands—*in pari delicto*—which forbade a plaintiff to recover damages if his fault was equal to the defendant's. See, e.g., *Holman v. Johnson*, 1 Cowp. 341, 98 Eng.Rep. 1120 (K.B. 1775) (Mansfield, C.J.). We need not worry about the precise scope of that doctrine. See, e.g., *THI–Hawaii, Inc. v. First Commerce Financial Corp.*, 627 F.2d 991, 995–96 (9th Cir.1980). It is enough to observe that a highwayman who decided to sue his partner for common law damages as well as for an equitable accounting for profits would surely have gotten no further with his "legal" claim than with his "equitable" one. Byron's claim to displace the young Clay is of similar character.

Perhaps no more need be said to affirm. But we add that even if Byron's case—all equitable considerations ignored—could be fitted within the letter of *Elrod*, it would not be within its spirit; and the letter killeth, while the spirit giveth life. The principle of *Elrod* is that civil servants should be free to choose their political associations without placing their jobs on the line. If a courthouse inspector supported Spann and was fired when Spann was defeated, the principle would come into play, and it wouldn't matter whether he was a good inspector or a bad one, provided he would not have been fired had he not supported the wrong candidate. But the inspector of Lake County courthouses was not expected to do *any* work, and did none. Byron's was the plummiest of patronage plums, the ultimate sinecure: all pay and no work. It would turn the principle of *Elrod* on its head to hold that it protects the spoils system of Lake County, Indiana by preventing a new administration from firing the despoilers. Byron was not a worker at all; it was as if he had received a cash grant from Lake County, in compensation for his political services. The First Amendment has not yet been interpreted to banish politics from government spending. *La-Falce v. Houston*, 712 F.2d 292 (7th Cir. 1983).

The merits of the spoils system can be debated; and there are those who believe that for the courts to attempt to abolish or even restrict it in the name of the First Amendment is quixotic at best. That is not our business. But we do think it would be too great a paradox to suppose that the First Amendment both forbids the spoils system and guarantees it. Of course the new Board of Commissioners might, if unable to fire Byron on political grounds, have simply abolished his job. But that is a speculative basis on which to entitle Byron either to recover his job or to obtain damages for having been fired. The adoption of such an approach would not promote First Amendment values. Instead it would give the Board of Commissioners a blueprint for political retaliation: abolish the job (and appoint junior Clay to some other, perhaps newly created, job), not the jobholder. We conclude that he who lives by patronage shall perish by it, without the First Amendment being violated thereby.

The values of the First Amendment were not impaired by the dismissal of Byron's suit; the values underlying the criminal justice system would be affronted by its

reinstatement. The dismissal may, perhaps, make the Rudy Byrons of this world a bit more cautious in supporting their political patrons, for fear of losing their jobs when their patrons lose an election—but equally it may make them more zealous in their support, knowing that their fate is tied inextricably to that of their patrons. The Rudolph Clays, Jr. of this world may be marginally emboldened by the dismissal of this suit, knowing that a patron who prevails in the electoral struggle will be able to reward them with government jobs, albeit not permanent ones. The patrons themselves might participate less enthusiastically in the political process if forbidden to bestow patronage on supporters. Cf. *Fraternal Order of Police Hobart Lodge # 121, Inc. v. City of Hobart,* 864 F.2d 551, 555 (7th Cir.1988); Riordan, Plunkitt of Tammany Hall 11–16 (1905).

The question posed at the outset of this opinion—the question presented in the plaintiff's own words by this appeal—almost answers itself. It is all very well to speak with Lord Coke of the "artificial reason" of the law, see *Prohibitions del Roy,* 12 Co.Rep. 63, 65, 77 Eng.Rep. 1342, 1343 (1608); but when a court is urged to reach a result that could *not* be made intelligible—that must seem ridiculous—to educated lay persons, it is a hint that the result may be wrong as a matter of law. It would mock the First Amendment to hold that it entitles a ghost employee to reinstatement with back pay in his sinecure (in violation of state criminal law) because he lost the job as a sequel to the defeat of the patron who had given it to him as a reward for political services. We do not believe that this is what the Supreme Court intended by the *Elrod* decision or that such an interpretation would promote the objectives of the First Amendment, let alone strike an equitable balance between those objectives and state criminal law.

The cross-appeal is dismissed, and the judgment is AFFIRMED.