**INNOVATIVE CLINICAL SOLUTIONS, LTD., et al., Plaintiffs,**

v.

**CLINICAL RESEARCH CENTER, P.C., et al., Defendants.**

No. 01–3326.

United States District Court, C.D. Illinois, Springfield Division.

Nov. 20, 2001.

Timothy J. Howard, Tracy C. Litzinger, Howard & Howard Attorneys, P.C., Peoria, IL, for Plaintiffs.

Stephen J. Thomas, Peoria, IL, for Defendants.

## ORDER

SCOTT, District Judge.

This matter came before the Court on November 14, 2001, for hearing on Plaintiffs Innovative Clinical Solutions, Ltd. and Clinical Studies, Ltd.s' (collectively ICSL) Motion for Temporary Restraining Order. Plaintiffs appeared by attorney Tracy Litzinger. Defendants Anjuli Nayak, M.D. and Nicholas Nayak, M.D., appeared personally, and attorney Stephen Thomas appeared for all Defendants. For the reasons set forth below, the Motion is DENIED.

ICSL is a national site management organization engaged in the business of performing clinical drug trials. Defendants Anjuli Nayak, M.D. and Nicholas Nayak, M.D., own Defendant Clinical Research Center, P.C. (CRC). CRC conducted clinical drug trials in Central Illinois. On January 1, 1999, ICSL bought substantially all of the business assets of CRC. As part of the transaction, CRC and the Nayaks individually entered into a Clinical Research Management Agreement with ICSL (Agreement). The Agreement referred to CRC as Management, and to the Nayaks as Management's Shareholders. CRC agreed to be responsible for the day-to-day operations of the acquired business. CRC agreed to act, through its employees or agents, as the Principal Investigator for the drug trials at the acquired business location. The Agreement defined the locations of the acquired business as a site. The Principal Investigator of a clinical drug trial is responsible for the trial under Food and Drug Administration rules. Anjuli Nayak was the Principal Investigator on the drug trials at the site. ICSL agreed to perform the business and accounting functions for the acquired business, including payroll, record maintenance, collection of receivables and payment of bills.

The Agreement had a term of forty years. If either side defaulted on its performance under the Agreement, the non-breaching party could give notice of default and terminate the Agreement if the default was not cured within thirty days. In addition, either side could terminate the Agreement immediately if the other party filed a voluntary petition in bankruptcy.

The Agreement also had several covenants. The covenant in Section 4 required Management to, "act exclusively on behalf of [ICSL] in managing the Business...." Section 7 prohibited either party from disclosing the other party's confidential information. Section 8 contained restrictive covenants. Section 8.1 stated:

That during the term of this Agreement, and for a period of three (3) years after the termination hereof (the "Restrictive Covenant Period"), Management and Management's Shareholders shall not, directly or indirectly, for themselves or on behalf of any person or entity (i)

contract with another [site management organization] or organization providing site management activities for the purposes of directly or indirectly engaging in the activities contemplated by this Agreement, or (ii) engage in business as a site management organization or provide site management activities....

This provision shall apply individually to each of Management's Shareholders throughout the Restrictive Covenant Period notwithstanding the fact such Shareholder ceases to be involved with or to be a Shareholder of Management prior to the end of such period.

Section 8.2 provided:

Management and each of Anjuli Nayak and Nicholas Nayak covenant and agree that during the Restrictive Covenant Period, unless otherwise agreed in writing by [IC SL], Management shall not, directly or indirectly, for itself or on behalf of any person or entity, hire or attempt to hire any then current employee of [ICSL] or take any other action which would encourage any such employee to leave the employment of [ICSL]....

Section 8.3 stated:

Notwithstanding anything to the contrary contained in Sections 8.1 or 8.2, in the event that this Agreement ... (ii) is terminated by Management as a result of [ICSL's] material breach of this Agreement, the Restrictive Covenant Period shall end on the effective date of the termination of the Agreement.

Section 10 of the Agreement authorized filing suit in the event of a breach. The section stated:

Each party expressly recognizes that any breach of this Agreement will result in irreparable injury to the other party and agrees that the other shall be entitled, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction, either in law or in equity, to obtain damages for any breach of this Agreement, to enforce the specific performance of this Agreement by the other party hereto, and because a remedy at law is inadequate, to enjoin the other party from activities in violation of this Agreement....

Section 14 to the Agreement provided for mediation and arbitration. Section 14.1(a) stated, in part, "If ... a dispute arises between [ICSL] and Management concerning the terms hereof, and such dispute is not resolved within thirty (30) days, the parties agree to attempt to settle the dispute by mediation...." Section 14.2 stated in part, "In the event a dispute is not settled through the procedures outlined in Section 14.1, the matter shall be resolved by binding arbitration...."

As part of the business acquisition, ICSL also executed a Subordinated Nonnegotiable Note (Note) in the original principal sum of $4,078,269 payable to Anjuli Nayak. The first payment of $2,000,000 was due April 1, 1999. That payment was made. The Note called for a second payment of $1,200,000 on January 1, 2002, and a final payment of $872,000 on January 1, 2004. Filing bankruptcy by ICSL constituted a default under the Note. In the event of default, Anjuli Nayak could accelerate the Note and declare all sums immediately due and payable.

The business acquisition transaction also obligated ICSL to pay a monthly fee to the Nayaks of $75,000. Neither party has submitted a document that memorializes this fee, but both parties agreed at the hearing before this Court that ICSL was obligated to pay such a monthly fee as part of this transaction.

On July 14, 2000, ICSL filed Chapter 11 bankruptcy. ICSL negotiated the bankruptcy reorganization plan with third party

creditors before filing. ICSL filed its Plan of Reorganization (Plan) at the time it filed bankruptcy. Defendants claimed that they received no notice of the bankruptcy proceeding, but ICSL claimed that Defendants were notified. ICSL, however, did not submit any evidence regarding the notice given to Defendants.

■ The Bankruptcy Court entered the Confirmation Order approving the Plan on August 25, 2000. The Confirmation Order stated that non-debtor parties to executory contracts that ICSL assumed under the Plan did not object to the Plan and that all defaults under such contracts would be cured under the Plan. The Agreement constituted an executory contract under the Bankruptcy Code because each party to the Agreement still had substantial obligations to perform at the time of the filing. 11 U.S.C. Section 365; *In re Streets & Beard Farm Partnership*, 882 F.2d 233, 235 (7th Cir.1989).

The Confirmation Order did not state whether ICSL's Plan called for assuming the Agreement, and ICSL did not provide evidence to establish this point, but represented to the Court that the Agreement was assumed under the Plan. The Confirmation Order also discharged all claims not otherwise provided for in the Plan and enjoined any actions to enforce any discharged obligation. The Confirmation Order did not indicate how the Plan treated the Note, but ICSL represented to the Court that it remained liable on the Note after reorganization.

In August 2001, ICSL stopped paying the $75,000 monthly fee to Defendants and stopped paying at least some of the expenses at the site managed by the Defendants. Counsel for ICSL stated at the hearing that ICSL stopped paying the fee because Defendants breached the Agreement. Counsel stated that Defendants incurred moving expenses that ICSL questioned and did not provide adequate documentation to justify the expenses. ICSL did not provide any evidence regarding these assertions. ICSL further submitted no evidence to establish that it performed its obligations under the Agreement. ICSL also provided no evidence to establish whether ICSL gave the Nayaks notice of the default and an opportunity to cure the default before withholding the $75,000 monthly fee.

Counsel for ICSL stated to the Court that in September 2001 the Nayaks began contacting the drug companies and other third parties for which clinical trials were being conducted at the site managed by Defendants (collectively Drug Trial Contractors). These trials were being conducted pursuant to contracts between ICSL and the Drug Trial Contractors. According to ICSL, the Nayaks told these Drug Trial Contractors to stop dealing with ICSL and to start dealing with the Nayaks directly. ICSL presented no evidence, however, that either Anjuli or Nicholas Nayak made any such contacts in August or September 2001.

Defendants submitted evidence indicating that the Defendants and ICSL were corresponding through counsel in August and September 2001, regarding ICSL's non-payment of the $75,000 monthly fee and the moving expenses. On September 6, 2001, Defendant's counsel Stephen Thomas responded to ICSL's general counsel James Redding by correspondence regarding payment of moving expenses. The letter indicates that ICSL is in default under the Note and Agreement because it filed bankruptcy. On September 17, 2001, Thomas sent Redding an accounting of unpaid expenses. Thomas states in his affidavit that he received no response at that time.

On October 4, 2001, the Defendants sent ICSL notice of termination of the Agreement citing the provision of the Agreement authorizing termination if ICSL filed bankruptcy. On that date, Anjuli Nayak declared the Note to be in default because of the bankruptcy filing and demanded immediate payment of the Note in full.

On October 5, 2001, several of the ICSL employees at the site resigned as ICSL employees and were then hired directly by the Nayaks. That same day, Anjuli Nayak sent letters to Drug Trial Contractors directing those parties to deal directly with her. At least some of the Drug Trial Contractors began sending payments to the Nayaks directly instead of ICSL.

ICSL's general counsel Redding telephoned Defendant's Counsel to attempt to mediate the dispute. On October 7, 2001, the Nayaks sent ICSL a notice of material breach of the Agreement. This notice declared ICSL to be in default under the Agreement for its failure to provide services called for in the Agreement and failure to meet financial obligations. Defendants gave ICSL thirty days to cure. The October 7th letter also demanded mediation of the default on the Note. The letter contained a list of unpaid bills totaling $302,956.57. The letter said Anjuli Nayak would continue to collect payments directly from Drug Trial Contractors until all sums due her were paid in full. Redding responded on October 15, 2001, demanding mediation and arbitration of all disputes. On October 16, 2001, Thomas wrote back stating that Defendants would mediate all issues. The letter stated that ICSL's unpaid obligations at the site exceeded $160,000.00.

ICSL then filed this action on October 25, 2001. The action claims breach of contract, breach of covenants, and tortious interference with ICSL's business relations. ICSL filed its Motion for Temporary Restraining Order with its complaint. The motion was first heard by Judge McDade of this Court on November 2, 2001. During the hearing, information came to light that required Judge McDade to recuse himself. The matter was then reset for hearing on November 14, 2001, before this Court. In the interim, on November 8, 2001, the Defendants gave ICSL notice that the thirty days had expired since the October 7, 2001, notice, and the Agreement was terminated because ICSL had failed to cure the defaults.

■ ICSL's Motion for Temporary Restraining Order asks the Court to restrain the Defendants from: (1) violating the covenants in the Agreement, (2) otherwise breaching the Agreement; (3) interfering with ICSL's contractual relationship with its employees and Drug Trial Contractors; and (4) refusing to submit to mediation and arbitration called for in Section 14 of the Agreement. To secure this relief, ICSL must show: (1) a likelihood of prevailing on the merits, (2) an inadequate remedy at law, and (3) irreparable harm if the preliminary relief is denied. *Grossbaum v. Indianapolis–Marion County Bldg. Auth.*, 63 F.3d 581, 585 (7th Cir. 1995). If ICSL establishes these elements, the Court must then weigh the equities between the parties, considering both the harm to ICSL by denying the relief and the harm to the Defendants in granting the relief. The Court must also weigh the public interest, meaning the effect of the equitable relief on nonparties. *Id.*

■ ICSL has failed to show a likelihood of prevailing on the merits of its contract claims. A party asserting a right under contract must prove that it performed its obligations under that contract. *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir.2001). ICSL has submitted no evidence to show that it performed its

obligations under the Agreement. ICSL admits that it stopped paying the $75,000 monthly fee in August 2001, but states that it did so because Defendants breached the Agreement in August and September 2001. ICSL further alleges that it stopped paying expenses because the Defendants failed to provide proper documentation of certain moving expenses as required by the Agreement. ICSL, however, has presented no evidence to show that Defendants did anything improper in either August or September 2001. ICSL further has not shown that it gave Defendants a notice of material breach of the Agreement and an opportunity to cure any such defaults before withholding the $75,000 fee.[1]

In addition, Defendants have presented evidence showing that the Agreement is now terminated because ICSL failed to cure material breaches under the Agreement. Defendants gave ICSL two notices of default: the October 4, 2001, letter, and the October 7, 2001, letter. The October 7th letter asserted defaults for failure to perform services required by the Agreement and failure to meet financial obligations under the Agreement. The affidavits filed by Defendants state that ICSL did not provide the services called for under the Agreement. The affidavits further state that ICSL failed to pay ongoing business expenses as required by the Agreement. ICSL has submitted no evidence to contradict any of this. Defendants then terminated the Agreement on November 8, 2001, because ICSL failed to cure these breaches. ICSL again has submitted no evidence regarding this point.

Based on the evidence submitted, the Court finds it likely that Defendants can establish the Agreement was terminated on November 8, 2001. If so, the Agreement is no longer in effect and the restrictive covenants are terminated. Based on the current record before the Court, ICSL has no likelihood of establishing that: (1) it performed its obligations under the Agreement, or (2) that it has any rights under the Agreement after November 8, 2001. Therefore, ICSL has not shown any likelihood that it would be entitled to enforce any of the covenants in the Agreement, to require specific performance, or to invoke either the mediation or arbitration provisions of the Agreement.

■■■ ICSL has shown a likelihood of prevailing on the merits of its tortious interference claims. To establish tortious interference with the business relationship, ICSL must show: (1) the reasonable expectation of maintaining a valid business relationship, (2) Defendants' knowledge of ICSL's expectancy, (3) the purposeful interference by Defendants that prevents ICSL's expectancy, and (4) damages resulting therefrom. *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 568 N.E.2d 870, 878, 154 Ill.Dec. 649, 657 (1991). Purposeful interference requires proof not only of intentional conduct designed to interfere with the business expectancy, but also that Defendants committed some impropriety in doing so. *Dowd & Dowd Ltd. v. Gleason*, 181 Ill.2d 460, 484–85, 693 N.E.2d 358, 371, 230 Ill.Dec. 229, 242 (1998).

■■■ Prior to any termination of the Agreement, Defendants owed a duty to

---

1. The $75,000 fee is not mentioned in the Agreement, but both parties treated the monthly fee as integral to the Agreement: ICSL stated that Defendants' alleged breaches entitled it to withhold the fee; Defendants stated that the failure to pay the fee was part of ICSL's breach of the Agreement. The Court has not seen any documentation regarding the fee and so cannot determine its relationship to the Agreement. Based on the evidence and the representations of counsel, however, this Court views the fee as an obligation of ICSL integral to the Agreement for purposes of resolving this Motion.

ICSL under the Agreement not to interfere with ICSL's contractual relationships with either ICSL's employees or with the Drug Trial Contractors. In clear violation of this duty, Defendants intentionally induced ICSL employees to resign from ICSL and work directly for Defendants. Defendants further intentionally induced Drug Trial Contractors to sever contractual relationships with ICSL and deal directly with Defendants. Such activities prior to terminating the Agreement could constitute the type of improper intentional interference that would support ICSL's tortious interference claim.[2]

The evidence now before the Court indicates that the Agreement ended. Once the Agreement ended, Defendants had no further duty to ICSL regarding either its employees or its Drug Trial Contractors. ICSL has not presented any evidence of other improprieties in the Defendants' business activities unrelated to the obligations under the Agreement. Absent some proof of other improprieties, the Court finds no likelihood that ICSL can establish that the tortious interference continued past the date that the Agreement ended.

The evidence currently before the Court indicates that the Agreement ended no later than November 8, 2001. If the July 2000 bankruptcy constituted a default under the Agreement, however, then the Agreement may have ended on October 4, 2001. The Defendants' October 4th notice to ICSL stated that the July 2000 bankruptcy constituted a default under the Agreement. The October 4th notice declared the Agreement terminated immediately. The evidence indicates that the tortious conduct started on October 5, 2001, after this notice. If the July 2000 voluntary bankruptcy was a default under the

Agreement, then ICSL has not shown a likelihood of prevailing even on the tortious interference claim.

▪ The Bankruptcy Code provides that a debtor can, in a confirmed plan of reorganization, reinstate, or assume agreements in which the filing constitutes a default. 11 U.S.C. §§ 365(a), (b)(2) and 1123. ICSL's confirmed Plan cured the default and reinstated the Agreement if: (1) the Defendants received notice of the bankruptcy and so were bound by its terms, and (2) the Plan called for ICSL to assume the Agreement pursuant to Bankruptcy Code Section 365(a) so that the Agreement would remain in effect after reorganization.

Defendants did not present evidence establishing either of these two points, but the parties continued to operate under the terms of the Agreement for almost a year after confirmation. The Confirmation Order further stated that non-debtor parties to assumed contracts had no objections to the Plan. The Court, therefore, finds for the purposes of this Motion only, that ICSL could likely establish that the Plan cured any default that occurred by reason of filing the bankruptcy petition. [At the preliminary injunction hearing, the Court expects ICSL to present evidence to establish the effect of the bankruptcy on the Agreement and Note.]

If so, then the evidence before the Court at most indicates that beginning on October 5, 2001, until the Agreement ended on November 8, 2001, Defendants tortiously interfered with ICSL's contractual relationships with its employees and Drug Trial Contractors.

▪ The Court finds, however, that ICSL has not been irreparably harmed.

---

2. The Defendants state that they have defenses to this claim. The Court makes no decision in the Order regarding the efficacy of those defenses.

Irreparable injury, "denotes transgressions of a continuing nature such as constant breach of a contract resulting in damage to the good will of a business...." *Prentice Medical Corp. v. Todd,* 145 Ill. App.3d 692, 701, 495 N.E.2d 1044, 1051, 99 Ill.Dec. 309, 316 (1986).[3] In this case the tortious conduct ceased when the Agreement ended. The injury, therefore, can be ascertained and adequately recompensed through damages.

Furthermore, the potential injury to the public weighs against granting the requested restraining order to stop the alleged tortious interference. All parties agree that the interests of the public would be served by allowing the drug trials to continue so that effective new treatments for illnesses could be developed faster. The parties further agree that Anjuli Nayak must continue to act as Principal Investigator if the trials are to continue.

If the Court restrained Anjuli Nayak from maintaining her current direct contractual relationship with the Drug Trial Contractors, then ICSL would presumably be in charge of the drug trials once again. Based on the evidence before the Court, however, ICSL no longer has a contractual relationship with Anjuli Nayak, and so the Court is concerned that she would no longer act as Principal Investigator. If so, the parties agree that the drug trials would be in danger. Given the evidence now before the Court, the Court is unwilling to create the risk of injury to the public generally by granting the requested restraining order.

▇▇▇ Finally, the evidence currently before the Court indicates that ICSL comes to the Court with unclean hands. Under the doctrine of unclean hands, the plaintiff's fault in the situation may be relevant to determining the appropriate remedy. *Shondel v. McDermott,* 775 F.2d 859, 868

(7th Cir.1985). The evidence currently before the Court shows that ICSL breached the Agreement first in August 2001, two months before the evidence shows that the Defendants engaged in any improper conduct. ICSL refused to pay hundreds of thousands of dollars in obligations. This breach left the Defendants with the choice of either: (1) shutting down clinical drugs trials to the detriment of the Dr. Nayaks' patients and society generally, (2) lending money effectively to ICSL by paying expenses themselves with the hope that some day ICSL would pay them back, or (3) terminating the relationship. They chose the latter course, but may have improperly started to deal directly with employees and Drug Trial Contractors before completing procedures set forth in the Agreement for terminating the Agreement. If so, ICSL may be entitled to recover damages to compensate for injuries from that breach. But, ICSL's breach precipitated the problem; it should not be entitled to equitable relief that would effectively force the Defendants to run these clinical trials at their own expense with the hope that some day ICSL will start living up to its obligations. Given the relative fault of the parties in this case, ICSL should not be entitled to equitable relief.

ICSL alleges that it did not breach the Agreement first. It has presented no evidence, however, to support this allegation. Based on the evidence presented at this time, ICSL has failed to establish a right to a temporary restraining order.

Therefore, the Motion for Temporary Restraining Order (d/e 5) is DENIED. IT IS THEREFORE SO ORDERED.

---

3. The other cases cited by ICSL also involved ongoing wrongful conduct.